770 A.2d 233

NORTHWEST COVENANT MEDICAL CENTER, APPELLANT–APPELLANT, v. LEONARD FISHMAN, COMMISSIONER, DEPARTMENT OF HEALTH AND SENIOR SERVICES, AND WILLIAM WALDMAN, COMMISSIONER, DEPARTMENT OF HUMAN SERVICES, RESPONDENTS–RESPONDENTS.

Argued February 13, 2001—Decided April 23, 2001.

124

126

*Murray J. Klein*, argued the cause for appellant (*Reed Smith Shaw & McClay*, attorneys; *Mr. Klein* and *Jennifer L. Schwartz*, on the briefs).

*Daisy B. Barreto*, Deputy Attorney General, argued the cause for respondents (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney; *Mary C. Jacobson*, Former Assistant Attorney

General, of counsel; *Eileen C. Stokley*, Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

COLEMAN, J.

The primary issue in this case is whether the Department of Health and Senior Services' (DHSS) refusal to reallocate Northwest Covenant Medical Center's (Northwest) 1997 charity care subsidy was a quasi-legislative decision. If so, then the forty-five day time limit for appealing an agency action does not apply and Northwest may maintain its appeal if not barred by laches.

The Appellate Division concluded that the DHSS's charity care subsidy decision was a quasi-judicial determination; thus, the court ruled that the forty-five day time limit applied and was not satisfied. Alternatively, the court ruled that even if the forty-five day time limit was inapplicable, Northwest's appeal should nonetheless be barred based on the doctrine of laches. We disagree and reverse. We hold that the DHSS decision was more quasi-legislative than quasi-judicial in nature. Hence, the forty-five day time limit does not apply and the equitable doctrine of laches does not bar Northwest's appeal.

I.

In 1992, New Jersey enacted the Health Care Act (Act), which, in relevant part, subsidizes hospitals that serve a disproportionate number of low-income patients who are unable to pay their hospital bills. *N.J.S.A.* 26:2H–18.51 to –18.70. Charity care subsidies are distributed from the Health Care Subsidy Fund, *N.J.S.A.* 26:2H–18.58, and are calculated based on a statutory formula. *N.J.S.A.* 26:2H–18.58e (announcing total amount of charity care subsidy funds collectively available for eligible hospitals in a given year); *N.J.S.A.* 26:2H–18.59e (explaining statutory formula for allocating total subsidy amount among eligible hospitals). But even if a hospital qualifies for a subsidy, it does not necessarily receive a full "reimbursement" covering all of its actual charity

care expenses; rather, a hospital receives only its proportionate share of the total subsidy funded by the Legislature for that year. *Ibid.* For 1997, the year involved in this case, the Legislature appropriated $300 million for charity care subsidy payments. *N.J.S.A.* 26:2H–18.59e. Northwest was one of sixty-seven hospitals that sought a share of the 1997 charity subsidy.

Hospitals seeking charity care subsidies are "required to submit all claims for charity care cost reimbursement ... to the department in a manner and time frame specified by the Commissioner of Health and Senior Services." *N.J.S.A.* 26:2H–18.59b(3). Pursuant to the Act, the DHSS contracted with the UNISYS corporation (UNISYS) to process charity care claims and price them at the appropriate Medicaid rate, as required under the Act. UNISYS developed the Essential Health Services Claims Pricing System Manual (ECPS Manual), which sets forth the manner and time frame for hospitals submitting subsidy claims.

The ECPS Manual encourages hospitals to submit claims for charity care on a monthly basis according to a schedule published by the DHSS. If a claim is submitted in a timely manner and accepted, UNISYS then issues a "remittance advice" to the hospital "by the 5th working day after the monthly adjudication cycle date." The ECPS Manual also provides that, "[i]f a submitter fails to receive the requested remittance tape(s) or if there are problems with the remittance tape(s), it is the responsibility of the submitter to notify UNISYS in writing within fourteen days from the remittance date." Furthermore, "[t]he individual provider is ultimately responsible for the accuracy and validity of every ECPS claim submitted for payment."

Northwest is a non-profit, acute care medical center comprised of three member hospitals: (1) St. Clare/Riverside (St.Clare), (2) Dover General, and (3) Walkill Valley General Hospital. A large percentage of St. Clare's patient population is indigent and it historically has received a substantial charity care subsidy. In 1995, St. Clare began submitting its charity care claims electronically and identified an Elmer Bean as its contact person.

On February 2, 1996, the DHSS issued a schedule of monthly submission and remittance statement dates for the processing of subsidy claims. The memorandum specifically noted that "[c]laims submitted after the Submission Cut–Off Date through the Adjudication Cycle Date will most likely process, but are not guaranteed to process for the upcoming adjudication cycle." On September 27, 1996, DHSS issued a letter stating that the claims submission deadline for 1997 charity care subsidies was October 18, 1996.

For reasons unexplained, Northwest did not submit monthly claims for St. Clare as directed, but instead submitted claims for the entire year's cycle on October 18, 1996. Several other hospitals also submitted their claims based on the entire year's cycle. Moreover, St. Clare's charity care claims data contained numerous errors that prevented UNISYS from processing the claims; hence, a remittance advice was not issued. A dispute exists over whether UNISYS attempted to contact Elmer Bean, Northwest's designated contact person regarding charity claims, concerning the erroneous charity data that Northwest submitted for St. Clare. Despite that dispute, the DHSS, in an attempt to avoid a total loss by St. Clare, calculated the hospital's charity care subsidy by using Northwest's "aggregate pricing ratio." In other words, the DHSS used data from Northwest's other member hospitals to calculate a charity care subsidy amount for St. Clare. That subsidy was substantially less than the amount Northwest anticipated receiving for St. Clare.

On February 18, 1997, Northwest contacted UNISYS and was informed that St. Clare's request that its subsidy be determined using its hospital-specific data was rejected. On February 24, 1997, Northwest responded that it had not previously been told of any errors and requested that the Director of the Health Care Financing System recalculate the subsidy with the proper data. Despite Northwest's protest, three days later on February 27, 1997, the DHSS issued a memorandum to all sixty-seven participating hospitals detailing the charity care subsidies for 1997. St.

Clare was awarded a subsidy of $5.7 million, a shortfall of about two million dollars from that which it would have received had its claims been properly submitted. That same day, Northwest made a direct appeal to Leonard Fishman, the DHSS Commissioner, to increase St. Clare's subsidy.

At the same time, Northwest began pursuing a legislative solution. Northwest arranged a March 3, 1997, meeting with New Jersey State Senator Robert Littell and the DHSS. The DHSS staff explained to Senator Littell that recalculating St. Clare's subsidy would not be possible because it would take money from hospitals less able to self-subsidize their charity care. Charity care under the Act is a zero sum system, such that an increase for one hospital causes all other hospitals to realize a decrease. Because only $300 million was allotted for 1997, the DHSS observed that any increase to St. Clare would require recoupment from the other sixty-six hospitals that received subsidies. Senator Littell then requested that the DHSS calculate the figure that St. Clare would have been entitled to had it submitted a correct claim.

With corrected data from St. Clare, Commissioner Fishman responded to Senator Littell on May 29, 1997, by informing him of the amount that St. Clare would have received. The Commissioner also indicated that he

> would like to work with you and the Department of Human Services to determine whether any supplemental payments to Northwest Covenant Health Systems could be structured so as to draw down additional federal funds. According to federal rules, St. Clare's is one of the three hospitals in the State that [has] received more in subsidy payments in [State Fiscal Year 1997] than the federal government will permit the State to claim for federal match. Therefore any supplemental amounts would have to be paid after July 1, 1997 to have any possibility of federal matching funds.

Shortly thereafter, Senator Littell sponsored a supplemental appropriation for Northwest in the 1998 fiscal year budget. But on June 27, 1997, Governor Whitman exercised a line-item veto and excised the supplemental funding.

Northwest did not seek a stay of payment of the 1997 charity care subsidies. Consequently, the payments were made between

February 1997 and January 1998 in accordance with the allocation calculated by UNISYS. Northwest filed its notice of appeal with the Appellate Division on December 22, 1997. Northwest explains the delay in filing the appeal as follows:

After the legislative initiative failed, we expected that the Departments would correct Northwest Covenant's allocation, because the Departments had already calculated the additional amount due Northwest Covenant, and more than one-half of the monthly payments remained to [be] made. Additionally, when we received Commissioner Fishman's May 29, 1997 letter to Senator Littell, we believed the Department of Health had recognized that it had an obligation to pay Northwest Covenant the additional amount of charity care funding. In the letter, Commissioner Fishman said that the Department of Health wanted to work with Northwest Covenant to see that additional funds were paid to Northwest Covenant. The letter did not limit the discussion to providing additional funds through the legislative process. Rather, the letter simply said that the Department of Health would' work with Northwest Covenant to provide additional funds, as long as the funds could be provided in the next fiscal year. And if the Departments were not going to correct the allocation, we expected that the Departments would at least respond to our letters in which we formally requested that the allocation be corrected.

After the second to last payment for the year was made in mid-December 1997, without any of the additional amount due being paid, we finally concluded that the Departments were not going to correct the error in the allocation. At that point, we decided that Northwest Covenant would have to sue to obtain the Charity Care funding that it was due. On December 22, 1997, this appeal was filed.

Northwest moved for summary judgment and the DHSS filed a cross-motion to dismiss the appeal as untimely and as barred by the doctrine of laches. The Appellate Division denied both motions in an order dated July 30, 1998, but ordered "a limited remand to the Commissioner for [the] purpose of affording the opportunity for [Northwest] to make a record containing the factual and legal contentions it relied on and for the issuance of findings of fact and conclusions of law to enable [the c]ourt to complete its review."

In response to the remand order, the Commissioner on August 21, 1998, requested Northwest's counsel to submit to him "a written statement of the factual and legal contentions" that Northwest will rely upon and the "evidence that supports Northwest Covenant's factual and legal contentions[,] ... including the submission of accurate and timely data."

On the remand, Commissioner Fishman denied Northwest's request for recalculation of the 1997 charity care subsidies on October 19, 1998. The Commissioner found that "St. Clare's submissions of pricing tapes to UNISYS on October 18, 1996, were so technically flawed and grossly deficient that they failed to conform to submission specifications," and thus a remittance advice was not issued. He further stated that Northwest did not "exercise due diligence and neglected its duty to correct [its] errors," and that

the extraordinary remedy of recouping and redistributing 1997 charity care subsidy payments should not be undertaken in a case of this nature due to the limitations of the legislative appropriation. Since charity care is a zero sum system and was limited by a $300 [m]illion legislative appropriation in 1997, any additional payments to St. Clare's would necessitate recoupment of monies from sixty-six hospitals. Most significant is the fact that nearly 90% of the monies would come from hospitals that were less able to self-subsidize[ ] their own charity care.

Thereafter, Northwest submitted three additional certifications to the DHSS. In response, Commissioner Fishman filed a supplemental decision on October 30, 1998, finding that irrespective of whether Northwest was informed by UNISYS that its submission was deficient, Northwest should have known that there were problems with St. Clare's claim because it received a "remittance advice" for the other two hospitals in its system, but not for Northwest. Commissioner Fishman specifically noted that "Northwest Covenant had an obligation to contact the Department immediately in order to determine the status of [St. Clare's] submission," but failed to do so.

On November 14 and 17, 1998, Northwest once again submitted certifications to Commissioner Fishman. The DHSS objected, and Commissioner Fishman declined to reopen the matter.

Without reaching the merits of Northwest's appeal, the Appellate Division in an unpublished opinion rejected Northwest's claim for an increased subsidy because Northwest had not filed its appeal within forty-five days of the commissioner's memorandum detailing the amounts to which each hospital was entitled. *See R.* 2:4-1(b) (providing that appeals from a state administrative agency's final decision must be taken within forty-five days). Alterna-

tively, the Appellate Division held that Northwest's claim was barred by the doctrine of laches. The court noted that, "[t]o allow appellant to bring suit now would, in effect, reward it for not pursuing recoupment during the period of time when the other hospitals were being paid and could best absorb the pro rata reduction in the amount of their allocation." The court further stated that, "[e]ven if one were to choose the latest time to begin the running of the forty-five days, it would not be subsequent to June 27, 1997, the date the Governor exercised her line-item veto."

The court also concluded that the DHSS's decision was quasi-judicial because it involved "[Northwest]'s individual claim based upon the submission of figures by and peculiar to [Northwest], not the interpretation of a rule and the manner in which its interpretation affects appellant as an individual entity." Therefore, the court ruled that Northwest was subject to the forty-five day time limit for filing an appeal.

Alternatively, the court held that even if Northwest's appeal was not time-barred under *Rule* 2:4–1(b), its delay in seeking judicial relief until December 27, 1997, triggered the doctrine of laches. The Appellate Division was of the view that Northwest was aware in February 1997 that increasing its subsidy would decrease the subsidies of other hospitals, and that Northwest could have sought temporary restraints or emergent relief from the Commissioner pursuant to *N.J.A.C.* 1:1–12.6(a). Although Northwest's pursuit of an alternate political solution was rational, the court reasoned that "there is no reasonable explanation why [Northwest] waited an additional six months to file this appeal and, even at that, [did] not ask for a stay."

## II.

Northwest contends that the DHSS's decision not to reallocate the 1997 charity care subsidy after the Governor vetoed the supplemental appropriation encompassed de facto rule-making or quasi-legislative action, thereby making the forty-five day limit contained in *Rule* 2:4–1(b) inapplicable. It also argues that the

doctrine of laches does not apply because, as a matter of policy, the DHSS does not require a stay of payments pending a reallocation determination.

A.

Generally, an agency acting formally may do so through rule-making, which is quasi-legislative, or through adjudication, which is quasi-judicial. *In re Request for Solid Waste Utility Customer Lists,* 106 *N.J.* 508, 518, 524 *A.*2d 386 (1987). Because the DHSS could have used either procedure, the starting point of our analysis of whether Northwest's appeal to the Appellate Division was timely must be our Rules of Court. "Appeals from final decisions or actions of state administrative agencies or officers ... shall be taken within 45 days from the date of service of the decision or notice of the action taken." *R.* 2:4–1(b). The comment to that rule states that "this rule applie[s] only to the quasi-judicial actions and decisions of state administrative agencies adjudicating the rights of particular individuals, [the Legislature] having rejected a proposal that a time period also be prescribed for seeking review of the quasi-legislative actions of such agencies." Pressler, *Current N.J. Court Rules,* comment 2 on *R.* 2:4–1 (2001). Thus, the forty-five day rule applies only to an agency's quasi-judicial decisions that adjudicate the rights of a particular individual. Northwest asserts that the DHSS's final decision not to reallocate was quasi-legislative.

Next, we focus on how to distinguish quasi-legislative agency actions from quasi-judicial agency actions. An agency's action is quasi-legislative in nature

if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) consti-

tutes a material and significant change from a clear, past agency position on the identical subject matter, and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

[*Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 331–32, 478 *A.*2d 742 (1984).]

All six of those factors need not be present to characterize an agency's action as quasi-legislative. *Id.* at 332, 478 *A.*2d 742. The Administrative Procedure Act generally defines an administrative rule as any "agency statement of general applicability and continuing effect that implements or interprets law or policy." *N.J.S.A.* 52:14B–2(e).

Similarly, an agency determination can be regarded as a "rule" when it effects a material change in existing law. This feature relates not only to fairness to the individual party actually before the agency but to other persons as well. When an agency's determination alters the *status quo,* persons who are intended to be reached by the finding, and those who will be affected by its future application, should have the opportunity to be heard and to participate in the formulation of the ultimate determination.

[*Metromedia, supra,* 97 *N.J.* at 330, 478 *A.*2d 742 (citations omitted).]

When determining whether an agency decision is a quasi-judicial act, "[t]he crucial question[ ][is] whether the fact finding involves a certain person or persons whose rights will be directly affected." *Cunningham v. Department of Civil Serv.,* 69 *N.J.* 13, 22, 350 *A.*2d 58 (1975). Indeed, agencies engaged in quasi-judicial decision-making must "consider evidence and apply the law to facts as found, thereby exercising a discretion or judgment judicial in nature on evidentiary facts." *Handlon v. Town of Belleville,* 4 *N.J.* 99, 105, 71 *A.*2d 624 (1950). "The nature of the factual inquiries may be dispositive or assist in the disposition of the issue." *Cunningham, supra,* 69 *N.J.* at 22, 350 *A.*2d 58.

As an alternative to acting formally through rulemaking or adjudication, administrative agencies also may act informally. *Texter v. Department of Human Servs.,* 88 *N.J.* 376, 383–84, 443 *A.*2d 178 (1982) (citing David L. Shapiro, *The Choice of Rulemaking or Adjudication in the Development of Administrative Policy,* 78 *Harv. L.Rev.* 921, 923 (1965)). Although not easily defined, informal agency action is any determination that is taken without

a trial-type hearing, including investigating, publicizing, negotiating, settling, advising, planning, and supervising a regulated industry. *In re Solid Waste, supra,* 106 *N.J.* at 519, 524 *A.*2d 386. "[I]nformal action constitutes the bulk of the activity of most administrative agencies." *Id.* at 518, 524 *A.*2d 386.

 An agency has discretion to choose between rulemaking, adjudication, or an informal disposition in discharging its statutory duty, provided that it complies with due process requirements and the Administrative Procedure Act. *Id.* at 519, 524 *A.*2d 386. In the present case, like many others, the question whether the agency determination is rulemaking, an adjudication, or an informal disposition is a close one. *Metromedia, supra,* 97 *N.J.* at 332, 478 *A.*2d 742. "The various kinds of action can overlap, and the line between agency rulemaking and adjudication, on the one hand, and informal action, on the other, can become blurred." *In re Solid Waste, supra,* 106 *N.J.* at 518, 524 *A.*2d 386. "Frequently, the agency determination is a hybrid, .... [and t]he inquiry can be further clouded because ... an agency can promulgate a rule that is highly particularized, constituting, in effect, 'individualized rule-making.' " *Metromedia, supra,* 97 *N.J.* at 332, 478 *A.*2d 742 (citations omitted).

## B.

 Northwest argues that the forty-five-day time period for filing an appeal does not apply because the DHSS's allocation of charity care subsidies was a quasi-legislative act consisting of the allocation of a fixed amount ($300 million in 1997) among the eligible hospitals. Given that there is only one fixed sum for distribution that affects all sixty-seven hospitals, Northwest argues that the DHSS allocation decision did not involve only Northwest's individual claim. It views the DHSS's action as a policy determination rather than a quasi-judicial determination.

We are persuaded by our careful review of the record that the DHSS used a hybrid procedure that involved informal actions, rulemaking, and adjudication for resolving Northwest's request

that its data be treated as accurate and timely, that its calculations be based on that data, and short of that, that there should be recalculation and recoupment to ensure that Northwest receives its full charity care subsidy. The ECPS Manual, which sets forth the time and manner for hospitals to submit charity subsidy claims, was designed to cover all sixty-seven hospitals. Substantial informal action was taken to collect data and calculate charity care in accordance with the ECPS Manual.

During part of the time that the DHSS was attempting to address Northwest's request to recalculate St. Clare's charity care subsidy, it engaged in quasi-legislative action. Although attempting to address Northwest's requests, the DHSS was mindful that the underlying and primary issue was the allocation of 1997 charity care subsidies to all sixty-seven hospitals because each was affected by St. Clare's request. Charity care subsidies were distributed to all qualifying hospitals and calculated pursuant to a formula set forth in the Act that required those hospitals with higher charity care costs to receive a greater proportion of the payment. Indeed, the Legislature appropriated only $300 million in 1997 and the DHSS acknowledged in its decision on remand that any additional payments to St. Clare's would require recoupment of funds from sixty-six hospitals. That was part of the reason that Senator Littell sponsored a supplemental appropriation later vetoed by the Governor. Clearly, the DHSS's allocation of the 1997 charity care subsidies had a "wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group." *Metromedia, supra,* 97 *N.J.* at 331, 478 *A.*2d 742. Hence, that allocation was both quasi-legislative and informal in nature during the period in which weeks stretched to months as the parties attempted to effect a legislative solution.

Prior to the remand proceedings, the process undertaken by the DHSS was devoid of any of the trial-type procedures that typically accompany a quasi-judicial action. That is precisely the reason the Appellate Division remanded the matter. In order to

acquire the requisite finality for triggering the forty-five day period prescribed by *Rule* 2:4–1(b), the "agency decision should contain adequate factual and legal conclusions. The decision also should give unmistakable notice of its finality." *In re CAFRA Permit No. 87–0959–5*, 152 *N.J.* 287, 299, 704 *A.*2d 1261 (1997). A determination by an agency that does not contain proper factual findings and legal conclusions is not a final decision for appeal purposes under *Rule* 2:4–1(b). *Ibid.; Szczepanik v. Department of Treasury*, 232 *N.J.Super.* 491, 498–500, 557 *A.*2d 705 (App.Div. 1989), cited with approval in *CAFRA.* There was no hearing officer, and there is no evidence that Northwest had an opportunity to have a hearing, or present witnesses or evidence prior to the remand. That demonstrates a lack of final adjudicative decision making. The record demonstrates that the February 27, 1997 DHSS letter to all the hospitals was not an unmistakable denial of Northwest's request for a reallocation of the 1997 subsidy payments. The record demonstrates that the DHSS did not make a final decision until it issued its Decision on Remand on October 19, 1998, approximately twenty months after Northwest made its formal request. As noted previously, although the DHSS subsidy allocation does not fall squarely within the parameters of quasi-legislative agency action, it is well-established that "[a]dministrative agencies have wide discretion in selecting the means to fulfill the duties that the Legislature delegated to them." *Texter, supra,* 88 *N.J.* at 383, 443 *A.*2d 178.

The first clear-cut quasi-judicial action occurred on October 19, 1998, when the DHSS issued its Decision on Remand. That was the first time that a trial-type hearing was conducted. Based on the evidence that was presented, the DHSS made factual findings that specifically adjudicated Northwest's claims for reallocation of St. Clare's 1997 charity care subsidy.

Given the torturous procedural route to a final administrative decision on Northwest's claims, "the line between adjudication and rule-making [is] ... shadowy [and blurred] and ... [Northwest] should not be prejudiced where [it] proceeded in [a] timely fashion under one of the rules." *McKenna v. New Jersey Highway Auth.,*

19 *N.J.* 270, 276, 116 *A.*2d 29 (1955). Clearly, the December 22, 1997, notice of appeal was timely because the agency did not render its final adjudicative decision until October 19, 1998, when it issued its Decision on Remand. It was not until then that there was service of notice of unmistakable finality of the agency's decision. On the other hand, the quasi-legislative informal process ended June 27, 1997, when the Governor exercised a line-item veto and excised the supplemental funding. Although the notice of appeal was timely based on the agency's final adjudicative decision, it also was timely after the quasi-legislative informal process ended if it was not barred by laches.

## C.

We turn now to the question of whether Northwest's appeal from the quasi-legislative informal disposition should be barred as untimely under the doctrine of laches. Northwest argues that laches should not apply because it reasonably believed that there was no "time limitation upon when a challenge to the calculation of Charity Care allocations must be brought and therefore ... had no reason to believe that it could not recover the amount owed to it if its efforts to obtain a political resolution failed." Northwest further contends that the DHSS conceded, in an unrelated appeal, that there is no legal prohibition to recalculating the charity care subsidy. The Appellate Division concluded that Northwest's claim was precluded by the doctrine of laches.

Laches is "an equitable defense that may be interposed in the absence of the statute of limitations," *Lavin v. Board of Educ. of Hackensack,* 90 *N.J.* 145, 151, 447 *A.*2d 516 (1982), and has been defined as a " 'inexcusable delay in asserting a right.' " *City of Atlantic City v. Civil Serv. Comm'n,* 3 *N.J.Super.* 57, 60, 65 *A.*2d 535 (App.Div.1949) (quoting 30 *C.J.S. Equity,* § 112). But "laches involves more than mere delay, mere lapse of time. There must be delay for a length of time which, unexplained and unexcused, is unreasonable under the circumstances and has been prejudicial to the other party." *West Jersey Title & Guar. Co. v. Industrial Trust Co.,* 27 *N.J.* 144, 153, 141 *A.*2d 782 (1958).

 Factors considered in determining whether to apply laches include "[t]he length of delay, reasons for delay, and changing conditions of either or both parties during the delay." *Lavin, supra,* 90 *N.J.* at 152, 447 *A.*2d 516. Further,

[t]he length of the delay alone or in conjunction with the other elements may result in laches. It is because the central issue is whether it is inequitable to permit the claim to be enforced, that generally the change in conditions or relations of the parties coupled with the passage of time becomes the primary determinant. That is why some courts have stated that the mere lapse of time is insufficient, though, ..., that is an overstatement of the principle. Inequity, more often than not, will turn on whether a party has been misled to his harm by the delay.

[*Id.* at 152–53, 447 *A.*2d 516 (citations omitted).]

The primary factor to consider when deciding whether to apply laches is whether there has been a general change in condition during the passage of time that has made it inequitable to allow the claim to proceed. *State v. Weiswasser,* 287 *N.J.Super.* 287, 300, 671 *A.*2d 121 (App.Div.1996), *aff'd,* 149 *N.J.* 320, 693 *A.*2d 864 (1997).

When the notice of appeal was filed on December 22, 1997, the final payment of the 1997 charity care subsidy to the sixty-seven hospitals had not been made. The final payment was made in January 1998. The DHSS conceded during oral argument that recoupment from sixty-six of those hospitals can be achieved without any prejudice to them or to the DHSS even after the fiscal year has ended. Northwest reasonably could have believed that the final administrative action would not be taken until the last payment was made to the hospitals in January 1998. Indeed, the Appellate Division in its July 30, 1998 remand order apparently believed that, as of that date, there had been no final adjudicatory agency decision even though a notice of appeal had been filed. Viewed in that context, no one has been harmed by the delay. Consequently, the doctrine of laches does not bar the action.

D.

 Finally, our careful study of the record persuades us to conclude that the DHSS acted arbitrarily when it declined to

reallocate the 1997 charity care subsidy. The DHSS has conceded that reallocation and recoupment are not unusual. We therefore direct the DHSS to reallocate the 1997 charity care subsidy in order to increase St. Clare's 1997 charity care in accordance with the Commissioner's letter to Senator Littell dated May 29, 1997.

We recommend that the DHSS promulgate regulations establishing standards and procedures for contesting allocations of charity care subsidies to avoid many of the problems presented in this case.

### III.

The judgment of the Appellate Division is reversed. The matter is remanded to the DHSS for further proceedings consistent with this opinion.

STEIN, J., concurring

I concur in the Court's judgment. I also join in the Court's sound conclusion that Northwest Covenant Medical Center's (Northwest) appeal is neither time-barred under *Rule* 2:4–1(b) nor barred by the doctrine of laches. However, because the doctrine of laches is rooted in principles of equity, I am impelled to write separately to reflect my concern that the Court's disposition, although in favor of Northwest in all respects, substantially understates the equitable factors that overwhelmingly demonstrate the inappropriateness of applying laches to defeat its claim as well as the substantial meritorious justification for upholding its claim for approximately $2 million to correct an acknowledged underpayment in its 1997 charity-care subsidy.

I

A

The facts of this case should distress the executive branch of our State government. The simple version goes something like

this. St. Clare's Hospital, one of the member hospitals of Northwest, submitted on or before October 18, 1996 a timely claim for 1997 charity-care reimbursements to Unisys. That company was jointly hired by the Department of Human Services and the Department of Health and Senior Services (Department of Health) to process those claims. St. Clare's submission was concededly deficient in some respects. Unisys never informed St. Clare's that its submission was deficient and could not be processed.

On February 17, 1997, Northwest learned that St. Clare's 1997 charity-care funding had been reduced from $10.7 million in 1996 to $5.8 million in 1997. Northwest immediately contacted the Department of Health and learned for the first time that because its October 1996 submission was considered deficient, Unisys calculated its subsidy by applying the lower pricing ratios of Dover General Hospital, one of the other hospitals in the Northwest group. By February 20, 1997, Northwest had provided the Department of Health with a new submission that demonstrated that St. Clare's 1997 subsidy was approximately $2 million less than it should have been. A supplemental letter dated February 24, 1997, informed the Department that no one from Unisys had ever alerted staff at Northwest or St. Clare's to the fact that the October 1996 submission was not being processed.

At a March 3, 1997 meeting between Northwest and Department of Health officials, convened by Senator Robert Littell, the Department's representatives acknowledged that St. Clare's allocation was too low but expressed a reluctance to recalculate the charity-care distribution because the other sixty-six participating hospitals would be affected. As an alternative, Senator Littell offered to sponsor a supplemental appropriation to make Northwest whole. He did so and it was approved by the Legislature, but vetoed by the Governor on June 27, 1997.

The charity-care subsidy payments to the sixty-seven affected hospitals began on or about February 15, 1997, and continued in twelve monthly installments until January 15, 1998. After the

Department of Health acknowledged a substantial deficiency in St. Clare's allocation at the March 3, 1997 meeting, then Commissioner Fishman wrote to Senator Littell on May 29, 1997 and informed him that the charity-care allocation to St. Clare's Hospital was $1,964,554 too low. In that letter Commissioner Fishman expressed a desire to assist Northwest in obtaining supplemental payments. The letter stated:

> We would like to work with you and the Department of Human Services to determine whether any supplemental payments to North Covenant Health Systems could be structured so as to draw down additional federal funds.... [A]ny supplemental amounts would have to be paid after July 1, 1997 to have any possibility of federal matching funds.

Notwithstanding the Commissioner's offer of help, after the Governor's June 27 veto of the supplemental appropriation bill no action was taken by the Department during the remainder of 1997 to correct the allocation of charity-care funds among the sixty-seven participating hospitals.

Northwest filed this appeal on December 22, 1997. The Departments, represented by the Attorney General, moved to dismiss the appeal as untimely and barred by laches, asserting in their brief that Northwest "never moved for a stay of the 1997 charity care payments. Appellant failed to seek a stay before the January 1998 final monthly distribution of funds to other hospitals."

After a limited remand to the Commissioner of Health, who declined to provide relief to Northwest, the Appellate Division in an unpublished opinion held that Northwest's appeal was time-barred pursuant to *Rule* 2:4–1(b) and also was barred by laches. In addressing the laches issue, the Appellate Division adopted the Attorney General's contention that Northwest should have applied for a stay of the payments to the other hospitals, observing that Northwest "could have sought emergency relief in General Equity by filing [an] order to show cause seeking appropriate temporary restraints pending determination of a proper allocation."

### B

The foregoing summary of the material facts might well provoke one to inquire why, after the Department of Health learned in

early March 1997 of the deficiency in St. Clare's charity-care allocation—after only one monthly payment had been made to the other hospitals—no action was taken by the State to recalculate the allocation to adjust for St. Clare's approximately $2 million deficiency. That failure to recalculate the allocation is even more astonishing when the record is examined in more detail with emphasis on the State's explanations for resisting St. Clare's claim for re-allocation.

### 1. *Monthly v. Annual Filing*

During the remand proceedings before the Commissioner of Health, the Departments' brief alleged that St. Clare's failed to submit its charity-care claims on a monthly basis, instead filing the entire year's claim on or before Unisys's October 18, 1996 deadline. The Commissioner agreed with the Departments' contention. Northwest responded that although a schedule of non-mandatory monthly submissions had been promulgated, it understood the Unisys Essential Health Services Claims Pricing System Manual (Manual), paragraph 2F, to leave the issue of monthly versus annual filing to each hospital's discretion, and submitted an uncontradicted certification naming five other hospitals that elected not to submit pricing data on a monthly basis. A supplemental certification filed in the remand proceedings by the Department of Health's Health Care Financing Systems Unit's Director acknowledged that hospitals could elect not to submit claims monthly, although in her view monthly filing improved the accuracy of the hospital submissions.

### 2. *Quality of St. Clare's Initial Submission*

The record is unclear about the nature and extent of the deficiencies in St. Clare's initial submission to Unisys. A certification filed in the remand proceeding by an Economic Research Specialist in the Department of Health stated that Unisys processed St. Clare's initial submission on October 21, 1996 "and it was rejected due to missing revenue codes and because the claim detail lines exceeded 45 lines." Another certification in the remand proceeding characterized St. Clare's submission as "grossly

deficient." The Departments' Appellate Division brief stated that the submission was rejected because of numerous errors "such as failure to use correct submitter identification and provider numbers, and submitting claims detail lines that were in excess of readable limits." Northwest's healthcare computer consultant, Elmer Bean, certified that once the Electronic Media Claims (EMC) Error Report was received from Unisys on February 18, 1997, only one day was required for Northwest's staff to correct the deficiencies listed in the error report. Another consultant, Craig Rutledge, certified that after one day's work addressing the problems in the error report, St. Clare's next inpatient and outpatient submissions were usable and were processed by Unisys. He acknowledged that subsequent submissions were necessary to address claims for reimbursement that had been denied.

### 3. *Notice of Errors to St. Clare's/Remittance Advice*

On remand before the Commissioner, Northwest contended that it should have received a remittance advice from Unisys informing it of the errors in its submission, noting that the Unisys Manual expressly provides:

> All providers submitting claims to the NJMIS (New Jersey Management Information System) receive a hard copy remittance advice for reconciling their ECPS accounts.

[Manual at 1–4.]

> Remittance advice (both tape and paper) are mailed by the 5th working day following the monthly adjudication cycle date.

[Manual at 3–4.]

The Commissioner concluded, without any reference to the Manual, that St. Clare's was not entitled to a remittance advice because its claim submission was "not accepted for processing." Although no remittance advice was sent by Unisys to St. Clare's, the record reveals that Unisys had prepared an EMC error report, dated October 21, 1996, based on St. Clare's initial submission, but the error report was never sent to St. Clare's. It was picked up by a Northwest employee on February 17, 1997, after the 1997 charity-care allocation had been completed.

Concerning the issue of actual notice to St. Clare's that its initial submission was deficient, in the remand proceeding the Departments submitted a certification from a Unisys employee stating that on October 22, 1996, she had telephoned Elmer Bean, St. Clare's designated representative, at 201–625–6161, and informed him that "St. Clare's tape submission of October 18, 1996, had been rejected on October 21, 1996, and that the hospital would have to correct and resubmit its charity care tape."

The record demonstrates that the statements contained in the certification were incorrect. In their Appellate Division brief the Departments acknowledged that they could not substantiate the claimed notification. The Billing Agreement submitted by St. Clare's to Unisys in October 1995 listed the Hospital's telephone number, facsimile number, and address on the first page, and also listed the charity-care contact person as Elmer Bean, at 201–625–6161. In the remand proceeding, Northwest submitted certifications attesting that before October 1996 Mr. Bean's office was relocated and his telephone number changed. The certifications stated that a caller dialing his former telephone number would have been connected to the Hospital's central supply department.

More to the point, the record reveals that whether or not an attempt was made by Unisys to telephone Mr. Bean at the number listed on the Billing Agreement, no further attempt of any kind, neither by telephone, facsimile or letter, was made by Unisys employees to inform St. Clare's that its submission was deficient. In the remand proceeding, Commissioner Fishman initially found as a fact that a Unisys employee spoke with Elmer Bean. In his supplemental decision the Commissioner retracted that finding, but nevertheless blamed Northwest for failing to inquire about the status of its submission. He stated:

I find that whether or not there was telephone contact by UNISYS on October 22, 1996, the fact remains that Northwest Covenant received remittance advices for two of its three hospitals. At that point, Northwest Covenant knew or should have known that there were problems with its submission. Because of this information, Northwest Covenant had an obligation to contact the Department immediately in order to determine the status of its submission. I find that it failed to do so.

In my view, the Commissioner's conclusion is quite remarkable in view of the relative ease with which Unisys could have contacted Northwest and provided it with a copy of the error report prepared on October 21, 1996. His conclusion was endorsed in the Departments' brief to the Appellate Division:

> It was St. Clare's obligation to follow up on its submission within 14 days and to resubmit corrected data to Unisys.... Because St. Clare's submission could not go through the pre-process stage, the hospital did not receive a remittance advice. However, *despite imputed notice, through non-receipt of a remittance advice,* St. Clare's did not make the necessary corrections for its submission to be processed by the fiscal agent.
>
> [ (Emphasis added.)]

The originality of the Department's argument is astonishing: although Unisys never notified St. Clare's that its submission was deficient, St. Clare's should have known enough to correct its deficient submission because it received "imputed" notice through "non-receipt of a remittance advice."

### 4. *Unisys's Use of Dover Hospital's Pricing Ratios*

The parties disputed the reasonableness of Unisys's decision to use Dover General Hospital's pricing ratios in calculating St. Clare's 1997 charity-care allocation. (Unisys was required to calculate for each hospital two "pay to charge" ratios, one for inpatient admissions and one for outpatient services. Each ratio approximated the ratio of total claims priced at Medicaid payment rates divided by total claims priced at actual charges. For each hospital, the inpatient and outpatient pay-to-charge ratios were multiplied by the total inpatient and outpatient charges, respectively, to arrive at the priced charity-care reimbursement figure.)

St. Clare's Director of Finance certified in the remand proceeding that the Department should have used St. Clare's 1996 pricing ratios rather than the 1997 pricing ratios of Dover General Hospital. He noted in his certification that St. Clare's outpatient ratio for 1996 was 93.6% and its outpatient ratio for 1997 was 94.06%, a difference of only .46%, and that the inpatient ratios for those years also were almost identical. Although the Department's expert asserted that St. Clare's 1996 pricing ratios could not be used because they were based on the Medicaid rather than

the charity-care population, St. Clare's Finance Director replied that the outpatient services used by Medicaid and charity-care patients were virtually identical. Had the Department used St. Clare's 1996 pricing ratios, rather than Dover's, to calculate its 1997 allocation, the record reveals that its 1997 allocation would have been increased by about $1.6 million.

C

The Court's opinion cogently concludes, *ante* at 140–42, 770 *A.2d* 244–45, that the Appellate Division erred in applying the equitable doctrine of laches to bar Northwest's appeal. In justifying its application of laches, the Appellate Division adopted the Attorney General's contention on behalf of the Departments that Northwest "never moved for a stay of the 1997 charity care payments," the court concluding that laches applied because Northwest "could have sought . . . appropriate temporary restraints pending determination of a proper allocation."

Less than two months after the Appellate Division's decision, however, the Departments of Health and Human Services, in a brief filed in an analogous charity care dispute between the Departments and University of Medicine and Dentistry—University Hospital (UMDNJ), repudiated the legal position they had successfully advanced before the Appellate Division. In *UMDNJ v. Grant*, No. A–3014–99T3 (App.Div. Mar. 13, 2000), UMDNJ was disputing its charity-care allocation for calendar year 2000 on numerous grounds. Since July of 1999 the Department of Health had been distributing charity-care payments for the year 2000 on an interim basis predicated on the 1999 allocations. When UMDNJ could not resolve its dispute concerning its year 2000 allocation, it sought a stay from the Commissioner of further distributions of year 2000 allocations and of any recoupments from UMDNJ to recover overpayments made since July 1999. The Commissioner of Health denied the stay based on UMDNJ's failure to demonstrate a likelihood of success.

UMDNJ appealed to the Appellate Division contending, consistent with that court's decision in Northwest's appeal, that a stay was warranted if for no other reason than to avoid the argument that UMDNJ took no action to prevent the subsidy payments from being made to the other hospitals. UMDNJ asserted, as did the Attorney General in the *Northwest* appeal, that a stay was essential because if it were ultimately successful on appeal the other hospitals would be required to return funds they had received in excess of their revised allocation.

The Attorney General, on behalf of the Departments, rejected UMDNJ's contention and argued, contrary to the Departments' position in *Northwest*, that there was no need for a stay because the Department of Health had the ability to increase UMDNJ's allocation even after all of the year 2000 charity-care subsidy had been distributed:

> Appellant's argument is that irreparable harm will result because, if it is ultimately successful on its appeal, the amounts paid to other hospitals at the new rate may have to be disgorged by those hospitals, and that DHSS lacks the ability in any event to carry that out since all of the funds for the year will have been expanded. However, the payment of money has never been seen to constitute irreparable harm. Moreover, contrary to appellant's assertion, there is no legal prohibition to recalculating the FY00 charity care subsidy. DHSS certainly has the ability, through various mechanisms, to accomplish any readjustment, even after the end of the fiscal year.

The Attorney General's brief, although acknowledging that UMDNJ's position was consistent with the Appellate Division's holding in *Northwest*, remarkably concludes by asserting that the application of the holding in *Northwest*—a holding for which it had argued—would be "unworkable" in the UMDNJ matter:

> It is true that the court in *Northwest Covenant* indicated that prejudice could result to a hospital that was forced to return previously paid funds; as a result, the court invoked the equitable doctrine of laches so as to bar the appellant in that case from filing an untimely action. Application of that principle to the current context would be *unworkable*. If appellant's argument is accepted, then any time a single hospital contests any part of the calculation of the charity care subsidy, it will be able to enjoin any payment of the subsidy to all hospitals, on the ground that irreparable harm exists because such hospitals may in the future be required to return those monies. *This is clearly not what the Northwest Covenant court intended.*

[(Emphasis added.)]

Respectfully, that is precisely "what the *Northwest Covenant* court intended." Its holding, based on the Attorney General's inaccurate assertion that a stay should have been sought, could not have been clearer:

> Had appellant acted promptly and asserted its right earlier by filing the appropriate judicial or administrative intervention, we could have averted the prejudice to other hospitals resulting from their use of distributed funds by deciding the proper allocation in the same fiscal year and prior to the time that all the funds were to be distributed. In short, appellant's unexplained acquiescence in failing to seek emergent intervention after the Governor exercised her veto, combined with the change in conditions resulting from the distribution of the 1997 charitable subsidies, lead us to conclude that the within appeal is barred by the doctrine of laches.

Unsurprisingly, the Appellate Division denied by order UMDNJ's stay application.

## II

In view of the Departments' belated acknowledgment in the UMDNJ matter that Northwest need not have sought a stay because the Departments could supplement its 1997 charity-care allocation even after all payments had been distributed, it is incontestable that the Appellate Division misapplied the doctrine of laches in barring Northwest's appeal. Responsibility for that misapplication of laches must be shared by the Departments and the Attorney General.

Putting aside the Departments' recognition that no stay application was necessary, the application of laches to bar Northwest's appeal is, in my view, antagonistic to the equitable principles that inform the doctrine. It is well settled that laches is "an equitable defense that may be interposed in the absence of the statute of limitations." *Lavin v. Bd. of Educ. of Hackensack*, 90 *N.J.* 145, 151, 447 *A*.2d 516 (1982). Over one hundred years ago in *Hall v. Otterson*, 52 *N.J. Eq.* 522, 28 *A.* 907 (1894), our Chancery court observed that the doctrine is rooted in principles of equity, and noted that equitable principles, not just delay alone, should govern application of the doctrine:

> [T]he doctrine of laches in courts of equity ... is not an arbitrary or a technical doctrine.... But in every case, if an argument against relief, which otherwise

would be just, is founded upon mere delay, that delay, of course, not amounting to a bar by any statute of limitation, the validity of that defen[s]e must be tried upon principles substantially equitable. Two circumstances, always important in such cases, are the length of the delay and the nature of the acts done during the interval, which might affect either party and cause a balance, of justice or injustice, in taking the one course or the other, so far as relates to the remedy.

[*Id.* at 535, 28 *A.* 907 (quoting *Lindsay Petroleum Co. v. Hurd,* L.R., 5 P.C. 221, 239–40 (1874)).]

As we observed in *Lavin, supra,* "the central issue is whether it is inequitable to permit the claim to be enforced," and that "[i]nequity, more often than not, will turn on whether a party has been misled to his harm by the delay." 90 *N.J.* at 152–53, 447 *A.*2d 516.

As this record demonstrates, the equities in this dispute abound in favor of Northwest. The St. Clare's Hospital 1997 charity-care allocation was miscalculated by Unisys after it rejected St. Clare's submission without sending it the error report Unisys had generated, or even *notifying* it of the rejection. The miscalculation, in excess of $1.9 million, resulted from Unisys's decision to apply Dover Hospital's substantially lower pay to charge ratios, rather than St. Clare's virtually unchanged 1996 ratios, in calculating St. Clare's allocation. By late February or early March 1997, *less than one month after the first monthly payment of the 1997 charity-care allocation had been sent to the sixty-seven participating hospitals,* the Department of Health became aware that there had been a miscalculation of approximately $2 million, and by late May 1997 the Commissioner acknowledged in writing that St. Clare's 1997 charity-care allocation was understated by $1,964,554. Concededly, the intention then was to make St. Clare's whole through a supplemental appropriation sponsored by Senator Littell and passed by the Legislature. But when the Governor vetoed that supplemental appropriation, the Departments inexplicably took no action to recalculate the allocation among the hospitals to restore to St. Clare's the funds it had lost.

One can only wonder what principle of law or public policy—other than obeisance to the Governor's veto—could possibly have justified the Departments' failure to act. We are informed by the Attorney General's brief in the *UMDNJ* appeal that the Depart-

ments have "the ability, through various mechanisms, to accomplish any readjustment, even after the end of the fiscal year." The certification in the remand proceedings submitted by the Director of the Health Care Financing Systems Unit acknowledged as much when she stated that a reallocation to reimburse St. Clare's would require recoupment from sixty-six hospitals of amounts ranging from a maximum of $118,345 to a minimum of $4,692, with the largest recoupments taken from teaching hospitals such as Hackensack Medical Center ($118,345), Morristown Memorial Hospital ($84,476), Cooper Hospital ($82,621), Jersey Shore Medical Center ($64,045), and Atlantic City Medical Center ($59,-226).

It is self evident that the amounts recouped from those hospitals would have been substantially less if the Departments had corrected the charity-care allocation in March 1997 when the error was discovered. More to the point, the recoupment from those named hospitals and the remaining sixty-one hospitals would have served the salutary purpose of returning from those hospitals in the aggregate more than $1.9 million incorrectly and unnecessarily paid to them and justly due and owing to St. Clare's.

In another context we have reminded State government of its obligation to " 'turn square corners' rather than exploit litigational or bargaining advantages that might otherwise be available to private citizens." *W.V. Pangborne & Co. v. N.J. Dep't of Transp.*, 116 *N.J.* 543, 561, 562 *A.2d* 222 (1989) (quoting *F.M.C. Stores Co. v. Borough of Morris Plains*, 100 *N.J.* 418, 426, 495 *A.2d* 1313 (1985)). If State government had "turned square corners" in this case, St. Clare's would long since have received its full and correct 1997 charity-care allocation, and the claim of laches would never have seen the light of day.

For the reasons stated, I join in the Court's sound disposition of this appeal.

Justice LONG joins in this concurring opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—none.