THE INDEPENDENT ELECTRICIANS AND ELECTRICAL CONTRACTORS' ASSOCIATION OF THE STATE OF NEW JERSEY, THEODORE E. KRAINSKI AND WILLIAM BOJKO, PLAINTIFFS-APPELLANTS, v. NEW JERSEY BOARD OF EXAMINERS OF ELECTRICAL CONTRACTORS, DEFENDANT-RESPONDENT, AND NEW JERSEY CHAPTER, NATIONAL ELECTRICAL CONTRACTORS' ASSOCIATION, NEW JERSEY STATE COUNCIL OF ELECTRICAL CONTRACTORS' ASSOCIATIONS, A NEW JERSEY CORPORATION, HENRY L. VOGEL, ALFRED STOKES, KIRK E. WYMAN, SR., FRANCIS J. TUCKER AND PETER S. DYKEMA, INTERVENORS-RESPONDENTS.

Argued January 20, 1969—Final supplemental briefs June 16, 1969—Decided July 17, 1969.

468

*Mr. Leonard Etz* argued the cause for plaintiffs-appellants.

*Mr. Herbert Susser* argued the cause for intervenors-respondents (*Messrs. Brenman, Susser and Piper,* attorneys for intervenors New Jersey State Council of Electrical Contractors' Associations, *et als.*; *Mr. Joseph C. Glavin, Jr.* and *Mr. Gerald L. Dorf,* attorneys for intervenor New Jersey Chapter, National Electrical Contractors' Associations; *Mr. Susser* and *Mr. Glavin,* of counsel; *Mr. Richard Newman,* on the brief).

*Mr. Clinton E. Cronin,* Deputy Attorney General, argued the cause for defendant-respondent (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney; *Mr. Cronin,* of counsel).

The opinion of the court was delivered by

HALL, J. This case, attacking the constitutionality of the Electrical Contractors Licensing Act of 1962, *N. J. S. A.* 45:5A–1, *et seq.,* is before us for the second time. In our first opinion, reported at 48 *N. J.* 413 (1967), we directed a remand to the trial court, which had previously upheld the act, for additional proofs and further findings by the judge.

We expressed doubt, on the scanty record made at the first trial, as to whether a rational relation existed between the statutory scheme and the public evil sought to be met, and determined that the Board was obligated to go forward with an affirmative factual presentation in support of the validity of the statute. The areas which particularly concerned us were specified in a series of questions set forth at the end of the opinion. 48 *N. J.,* at 427–428.

On the remand the further presentation in support of the statute was largely undertaken by two contractors' associations who were permitted to intervene. Voluminous testimony was taken and the trial court once again held that the act was valid. Subsequently the statute was amended in certain important respects. *L.* 1968, *c.* 17. On oral argument, after the remand was returned to us, we granted leave to take additional testimony by way of depositions with respect to matters which were still unclear, and to file supplemental briefs.

While our first opinion fully treated the contentions of the parties and the relevant statutory provisions, we should review the pertinent aspects.

The act is regulatory in nature, providing for the statewide licensing of electrical contractors, as distinct from journeymen or master electricians, through defendant Board of Examiners. Plaintiffs concede the right of the state under the police power to assure the competency of electrical work through a licensing system because of the danger to life and property from faulty work. In other words, the existence of an actual or potential public evil is admitted. All parties agree that for a statutory licensing scheme to be valid, it must bear a rational relation to the evil sought to be guarded against. While it is axiomatic that the police power may not be invoked solely for the economic protection of particular individuals and groups, and that where the dominant purpose of legislation is to advance private interests under the guise of the general welfare it will be struck down, if in fact there appears an evil to the public health or welfare which a statute can fairly be considered to meet, and the means to the end are reasonable, then the legislative decision thereby embodied must be upheld, though private interests are incidentally served.

The attack here is by one segment of the electrical contracting industry, composed essentially of electricians employed in industry who also carry on small contracting businesses of their own on a part-time basis. Their claim

throughout has been, on substantive due process and equal protection grounds, that the act is a privately oriented measure for the benefit of full-time and larger contracting enterprises, represented by the intervenors, and that its purpose and effect is to restrict competition by the exclusion, at least to some extent, of the part-time contractor from the field. It is clear that the measure was originally sponsored by certain segments of the industry and that the matter of the public's protection from faulty electrical work was indeed secondary, beyond any gain to the public from the prohibition of separate municipal licenses previously required in some municipalities. While plaintiffs argue that the licensing scheme is not designed to meet the evil of faulty electrical work, their thrust is largely that it unduly restricts their right to engage in a lawful occupation. Further, it is to be noted that the constitutional attack waged here is broad based — plaintiffs seeking to have the entire act declared void, or at least certain provisions — and that the action is not directed toward individual relief because of alleged improper administration in particular instances.

The business regulated is that of "Electrical contractor", which is defined by *N. J. S. A.* 45:5A–2(*d*) as " * * * a person [including an individual, firm, corporation or other legal entity, *N. J. S. A.* 45:5A–2(*e*)] who engages in the business of contracting to install, erect, repair or alter electrical equipment for the generation, transmission or utilization of electrical energy * * *." The reach of the act is limited by certain exemptions specified in *N. J. S. A.* 45:5A–18 (about which more later) and by regulation of the Board.[1]

---

[1] The pertinent regulation exempting minor repair work provides that such work, in addition to the replacement of lamps and fuses spelled out in *N. J. S. A.* 45:5A–18(a), "shall also include but is not limited to the following: Replacing existing wall switches, plug in receptacles on existing outlets and sockets on existing incandescent fixtures."

The licensing scheme has a dual aspect, provided for in *N. J. S. A.* 45:5A–9(*a*). Before the electrical contracting business may be engaged in, the owning entity — whether that entity be an individual proprietor, partnership or corporation — must obtain a "business permit". This permit issues automatically when a "license" is secured from the Board by some individual — proprietor, partner, corporate officer or employee of the owning entity — "who is or will be actively engaged in the business for which a business permit is sought * * *." One licensee cannot qualify more than one entity for a business permit, but the statute does not expressly require more than one licensee per entity no matter how many workmen that entity may employ.

Initially a license could have been obtained in either of two ways. The first, which still exists, is by passing an examination given by the Board "to establish the competence and qualification of the applicant to perform and supervise the various phases of electrical contracting work", *N. J. S. A.* 45:5A–9(*b*), which examination "shall cover such matters as the provisions of nationally recognized electrical installation safety standards and the theoretical and practical application of the same encountered in electrical work", *N. J. S. A.* 45:5A–12. To be admitted to the examination, an applicant "shall have been employed or engaged in the business of electrical construction and installation or have equivalent practical experience for a period of not less than 5 years preceding the time of such application, or shall otherwise establish to the satisfaction of the board that [he] has the necessary educational background and experience to qualify to take the examination for a license." *N. J. S. A.* 45:5A–9(*b*).

The second method of obtaining a license — by far the most utilized to date (although the opportunity to take advantage of it has now expired) — is under the "grandfather" clause, *N. J. S. A.* 45:5A–10. This section provides that "any person who has been employed or engaged in the business of electrical contracting in this State for a period

of at least 6 years prior to the effective date of this act, and whose principal business for at least 2 years immediately preceding making of application * * * shall have been that of electrical contractor, shall be granted a license without examination; provided application should be made to the board on or before July 1, 1963 [later administratively extended for several months, we understand] and satisfactory proof is presented to said board of the applicant's fitness to engage in such business." The "satisfactory proof" included a description of the applicant's experience in the electrical contracting business and the listing of representative electrical contracts performed by him.

The issues that troubled us and that were noted in our first opinion, and as to which we directed further proofs and argument, fall into several categories. It is to be observed, in passing, that we must, of course, consider them, and the changes made by the 1968 amendment as well, in light of the judiciary's limited role in reviewing the validity of regulatory state legislation. As we previously recognized (48 *N. J.*, at 423–424), courts cannot be concerned with the wisdom or policy underlying a statute; that is almost invariably solely within the legislative domain and responsibility. So with respect to plaintiffs' claims that various provisions of the act deny them both substantive due process and equal protection, we are confined to considering whether the means set forth are rationally related to the end, and whether the classification is invidious.

The first area that concerned us was the failure of the statute on its face to require the individual licensee who qualifies an enterprise for a business permit to supervise and inspect the work performed. At the first trial of the case, it was agreed that such a requirement had to be read into the act in order for it to withstand plaintiffs' attack that it constituted an arbitrary exercise of the police power, although there was considerable doubt that the Board to that point had interpreted it in this way. Also involved here was the question of whether, as a practical matter, the act

afforded the public adequate protection since only one individual per business had to be licensed, rather than all individual journeymen, and since universal inspection of electrical work by an outside agency was not required.

The 1968 amendment to the act, L. 1968, c. 17, has expressly imposed the obligation of supervision and inspection. N. J. S. A. 45 :5A–9(a), as amended, states that the " * * * licensee shall assume full responsibility for inspection and supervision of all electrical work to be performed by the permittee in compliance with recognized safety standards". The amendment to N. J. S. A. 45 :5A–16, which deals with those situations where the Board may refuse to grant or renew, or may suspend or revoke a license or business permit, goes even further. It adds as grounds those instances where the holder has:

"(f) failed to adequately and properly supervise employees in compliance with recognized safety standards;

"(g) failed to secure inspection of electrical construction by an inspection authority approved by the board, or otherwise provided by law; or

"(h) failed to perform electrical construction in conformance with standards of the national electrical code then in effect and the standards, if any, of the municipality wherein such work is performed."

Consequently, it is now plain that not only must the licensee assume the responsibility of supervision and inspection, but also that he has the affirmative obligation, at the risk of loss of his license, to perform electrical work in conformity with fixed standards, to adequately supervise all employees and to secure inspection of the work by recognized authorities. In addition the business permit holder risks the loss of the permit as well, and so the right to engage in the business, if the licensee qualifying the business fails in his obligation. Any deficiency in the original statute in this respect has been thereby remedied. While the act still does not expressly require more than one licensee per business, the Board, in order to be assured that the affirmative obliga-

tions just mentioned will be properly carried out, may well deem it necessary to require large contracting businesses performing many jobs simultaneously to have additional licensees on their staffs.

We are also satisfied from the proofs on the remand that it was a proper exercise of legislative choice to provide for the method of licensing set forth in the statute rather than testing and licensing all journeymen electricians. Indeed, there was substantial uncontradicted testimony that the standard for the issuance of a license, were it required of all journeymen, would have had to be considerably lower than that required by the present examination and "grand-father" qualifications in order to provide a sufficient number of working electricians. It was pointed out that electrical installation, even in houses, have become more complex in the last three or four decades and that greater knowledge is required today to properly lay out, supervise, and perform safe electrical work than could be expected of every journey-man. Given a licensing system, no enterprise should be allowed to hold itself out to the public unless it is competent in all ordinary branches of work.

Therefore, we conclude, with respect to the problem just considered, that the statutory scheme, as amended, bears a rational relation to the evil of faulty electrical work.

■ The second area upon which we sought further evidence related to the double aspect of licensure. As noted, a license must be held by an individual actively engaged in the business, and, in addition, the business entity itself is required to secure a permit even in those instances where the licensee practices alone. Plaintiffs contend that this is an unreasonable classification, because it discriminates against sole proprietors, and so denies them equal protection. Early cases, somewhat analogous, appear to have gone both ways on the question, even in the same state. Compare ;e.g., State ex rel. Winkler v. Benzenberg, 101 Wis. 172, 76 N. W. 345 (1898) with City of Milwaukee v. Rissling, 184 Wis. 517, 199 N. W. 61 (1924), affirmed 271 U. S. 644, 46

*S. Ct.* 484, 70 *L. Ed.* 1129 (1926). See also *Clark,* "Occupational Licensing in the Building Industry," 1952 *Wash. U. L. Q.* 483, 514–515, 519–520.

We are not persuaded that this facet of our statutory scheme is constitutionally objectionable. As the testimony indicated, dual licensure furnishes the public with double protection since the individual licensee risks the loss of his license in the event of faulty workmanship, and the business permit holder his permit. Thus, a business entity would not be able to continue in business if it lost its licensee by simply hiring another in his place, a path which conceivably would be open, even in the case of the sole proprietor, if no business permit were also required. Therefore, in all types of enterprises there is more reason to adhere strictly to the safety obligations of supervision and inspection imposed by the amended statute. In fact, the proofs on the remand indicated a generally higher quality of electrical work since the act has been in effect. Moreover, the business permit issues without further testing when one actively engaged in the business has obtained a license, and the only additional burden on the sole proprietor is the $12.50 annual business permit fee. *N. J. S. A.* 45:5A–13, as amended by *L.* 1968, *c.* 17.

The third area we desired further exploration of related to the "grandfather" clause. *N. J. S. A.* 45:5A–10. This provision, it will be recalled, directed that, upon application prior to July 1, 1963, any person would be granted a license without examination if he had been employed or engaged in the electrical contracting business for at least six years prior to the effective date of the act and his "principal business" for the two years immediately preceding application had been that of electrical contractor. Section 10 further provided that the applicant must satisfy the Board of his fitness to engage in the electrical contracting business by describing his experience therein and by listing representative contracts he performed.

The additional proofs adduced, which to some extent refined our initial impressions of the actual operation of the clause (48 *N. J.*, at 418–419), indicated that the Board received approximately 4,000 applications for licensure under it, of which 3,000 were granted, accounting for the vast majority of the present number of licensees. For the most part, a license would be granted where the Board, on the basis of its members' knowledge of the electrical contracting business, determined that the jobs listed on the face of the papers submitted were sufficiently representative and evidenced the requisite experience. All but one of the Board members were connected with some aspect of the industry. In some cases, additional written information was requested, outside investigation was conducted, or the applicant was called before the Board to furnish further details orally.

There was no proof that the Board issued "grandfather" licenses to unqualified persons. Plaintiffs' principal position is that the two year "principal business" requirement constituted an unconstitutional denial of equal protection because competent electrical contractors, who were regularly employed in other pursuits and operated their businesses only on a part-time basis, were refused licenses without examination, although licenses were granted without a test to those no more qualified who were full-time electrical contractors.

It is not contended, nor could it well be, that all "grandfather" clauses are discriminatory and invalid. Such provisions are a practical necessity when a profession or trade is initially licensed and are based on the legislatively permissible assumption that those who have been engaged in the occupation for some time previous are therefore sufficiently qualified to continue in it without having to pass an examination. *Wasmuth v. Allen*, 14 *N. Y. 2d* 391, 398, 252 *N. Y. S. 2d* 65, 70, 200 *N. E. 2d* 756, 760 (1964), appeal dismissed 379 *U. S.* 11, 85 *S. Ct.* 86, 13 *L. Ed. 2d* 23 (1964); *State v. Durham*, 191 *A. 2d* 646, 651 (*Del. Super. Ct.* 1963). See Annot.: "Construction of 'grandfather

clause' of statute or ordinance regulating or licensing business or occupation," 4 *A. L. R. 2d* 667 (1949).

We think it is equally plain that the Legislature has, under fundamental principles, an especially wide discretion in determining what requirements it will impose in such a clause. *Cf. New Jersey Chapter, American Institute of Planners v. New Jersey State Board of Professional Planners,* 48 *N. J.* 581, 601–603, 609–610 (1967), appeal dismissed, 389 *U. S.* 8, 88 *S. Ct.* 70, 19 *L. Ed. 2d* 8 (1967). It can, for example, admit without examination all employed or engaged in the trade at the effective date of the law. Thus, our State Plumbing Licensing Law of 1968 (*N. J. S. A.* 45:14C–1 *et seq., L. 1968, c. 362*) directs, without more, the issuance of a master plumber's license without examination to any person employed or engaged in the plumbing business for five years. *N . J. S. A.* 45:14C–17. Or it can be more restrictive. As the New York Court of Appeals said in *Wasmuth v. Allen, supra* (14 *N. Y. 2d,* at 398, 252 *N. Y. S. 2d,* at 70, 200 *N. E. 2d,* at 760).: "Nothing turns on the circumstance that the Legislature excused under the grandfather clause some and not others from passing the basic subject test."

We are therefore of the view that the "grandfather" clause under review does not, on its face, deny plaintiffs equal protection because it requires one's "principal business" for the two years preceding application to have been that of electrcial contractor. The Legislature was entitled to conclude that such a provision would afford greater assurance to the public of competency in modern techniques for the safe laying out, supervising, and carrying through of diverse electrical work. While the clause could conceivably have been as effective from the standpoint of the public's safety if "grandfathering" had been authorized based solely on experience, regardless of the amount of a man's working time spent in the electrical contracting business, such is a matter of wisdom and policy exclusively within the legislative province.

An analogous question arose in New York where the administrative code of the City of New York authorized revocation or suspension of a master electrician's license if the holder was "principally engaged in other business". The court upheld the provision against constitutional attack, reasoning that if a person who is a master electrician is substantially engaged in some other business, his incentive to adhere to the safety supervision requirements and obligations is greatly reduced because license revocation or suspension, for him, would not sting so much. *Spielvogel v. Ford,* 1 *N. Y. 2d* 558, 154 *N. Y. S. 2d* 889, 136 *N. E. 2d* 856 (1956). Our Appellate Division likewise upheld the validity of the very provision now under consideration in *Henderson v. New Jersey Board of Examiners of Electrical Contractors,* 85 *N. J. Super.* 509 (1964), certification denied 44 *N. J.* 399 (1965).[2]

Our next area of concern related to the numerous exemptions, which appear in *N. J. S. A.* 45:5A–18(a)

---

[2] It seems apparent upon study of the testimony on the remand, the subsequent depositions, and the briefs that plaintiffs' complaint about the "grandfather" clause is really directed to the Board's interpretation and application of it in individual instances. The statute contains no definitions of the various terms used and unfortunately the Board promulgated no regulations with respect to its meaning or the standards for application, for the information of all affected persons. It purported to be acting on the basis of some oral opinion of a Deputy Attorney General, the exact nature of which is not at all clear from the record. The testimony as to how the Board handled individual applications of the types in which plaintiffs are particularly interested is still confusing, and we are not at all sure that the Board evenly applied the same criteria in all instances. There was testimony that men were granted "grandfather" licenses who were not proprietors, partners or corporate officers of a contracting business in a few instances and that such licenses were also granted in a small number of cases to men who were only part-time contractors. There was also evidence of rejections in such situations and clear testimony in two cases that licenses granted, based on sufficient contracting experience of the individual, were later revoked when the Board learned the licensee also held a full-time job, one as an electrician in the employ of the state. It was not until *Henderson* was decided over a year after the expiration of the "grandfather" clause that there was any authoritative determination that "principal

through (m),[3] of certain types of work from the business of electrical contracting and thus from the coverage of the statute. We previously questioned the reason for several of them in view of the fact that the public interest in safe electrical work was seemingly as much involved there as in the types of work covered by the statute. (48 *N. J.*, at 419–420). The testimony on the remand has dissipated our concern in all but two categories. Subdivisions (a), (b), (c) and (j) deal with minor work of a character not ordinarily giving rise to any substantial safety hazard. Subdivisions (d), (e), (f), (g), (h), (i) and (m) cover highly specialized electrical work carried on in mines, and on railway cars and elevators, and in connection with municipal and public electrical and communications utilities and heating and power equipment. The proofs satisfy us that in these special categories work is not performed by ordinary electrical contractors and, in any event, that it is subject to special safety standards, inspection and regulation by other agencies or means.

The two remaining categories are subdivisions (k) and (*l*). The former exempts electrical repair, manufacturing, maintenance and installation on premises occupied by a firm or corporation and performed by a regular employee who is a qualified journeyman electrician. The latter exempts

business" meant "the applicant's primary full-time occupation". 85 *N. J. Super.*, at 516. This unsatisfactory state of affairs in the administration of the clause is no ground for striking it down as unconstitutional on a broad based attack directed to the provisions of the act, nor can we determine in this proceeding the merits of various individual grievances testified to.

[3] The amendatory statute, *L.* 1968, *c.* 17, made only a slight change, not of consequence here, in the previous subdivisions of this section. It did, however, add subdivision (n) which further exempts "Work performed by a person on a dwelling that is occupied solely as a residence for himself or for a member or members of his immediate family." The effect apparently was to embody in the act an exemption which the Board had previously recognized. Its validity has not been argued here. *Cf. Sands v. Board of Examiners of Electrical Contractors*, 54 *N. J.* 484, decided this day.

electrical installation, repair or maintenance performed by regular employees (with no requirement that such employees even be journeymen electricians) of the state or of a municipality, county or school district on the premises or property owned by those entities. The undisputed testimony of the intervenors' expert, a professor of electrical engineering knowledgeable in the field, was that these two exemptions, especially the latter one, were not "proper" and could jeopardize the public safety through unsupervised and incompetent work. The trial judge agreed, but decided that that fact should not vitiate a statute "otherwise constitutionally sound". He did not consider severability and excision of the two subsections, which would involve determining whether the Legislature would have passed the act without them, a matter not free from doubt as we view the legislative history. It may be noted in passing that these two exemptions would obviously run counter to the economic interest of the electrical contracting industry and undoubtedly did not originate with the sponsors of the act.

We share the misgivings of the expert and the trial court, but we are forced to conclude that there is no violation of the equal protection clause by virtue of these two exemptions. The question as to the reach of a statute is one of legislative responsibility, essentially outside the judicial realm. The settled principles dictating this conclusion have been most recently stated by this court in *New Jersey Chapter, American Institute of Planners v. New Jersey State Board of Professional Planners, supra,* in the following language:

"Equal protection is not denied because a regulatory statute might have gone farther than it did, or might have included some persons or classes of persons who were excluded. Regulatory need in a particular field may appear to the legislative mind in different dimensions and proportions; as more acute in one area than in another. Consequently the reform may proceed one step at a time, addressing itself to the aspect of the problem which seems the most pressing. * * * In short, equal protection does not demand immediate logical tidiness; nor is it violated because the legislation as enacted does not

bring about the full reform or result intended to be produced. In an area of many competing pressures the constitution is satisfied if the Legislature, in responding to what it conceived to be living facts calling for regulation, did not disregard reason in drawing its lines. That those lines might have been drawn more suitably in light of the whole problem is not a matter for judicial re-examination. Classification is a perennial and difficult problem, capable of no doctrinaire solution. Basically the solution resides in the legislative domain and the judiciary will not intrude unless the classes established for separate treatment represent invidious discrimination, that is, treatment which has no rational basis in relation to the specific objective of the regulatory legislation. * * *" (48 *N. J.*, at 602–603).

Accordingly, we cannot say that there was no rational basis for the Legislature including exemptions (k) and (*l*) in the statute, on the thesis that it may proceed one step at a time.

 Finally, we also originally expressed concern about the substantial fees imposed by the statute, *N. J. S. A.* 45:5A–13, (48 *N. J.*, at 419). *L.* 1968, *c.* 17 reduced the fees somewhat and the remand testimony shows that since the first two years of operation, the revenues produced have been much more closely related to the expenses of administration. Plaintiffs have not since urged any invalidity based on excessiveness and we believe the fees are not subject to attack on this ground. Moreover, the state may properly, for general revenue purposes, exact license fees beyond the cost of regulatory administration.

 At the oral argument, plaintiffs raised the additional objection that subdivision (h) of *N. J. S. A.* 45:5A–16, added by the 1968 amendment and previously quoted in full, was illegal in that it requires performance of electrical construction in accordance with the standards of the National Electrical Code. The claim was that this amounts to an unconstitutional delegation of legislative authority to a private organization to set standards. While we have struck down delegations of authority to private organizations amounting to the power to license, see *Group Health Insurance v. Howell,* 40 *N. J.* 436 (1963), we have sustained statutory delegation as to standards promulgated by a source other than the Legislature itself or one of its agencies, as, for

example, by an agency of the federal government. See *State v. Hotel Bar Foods*, 18 *N. J.* 115 (1955).

The testimony here shows that the National Electrical Code is the standard accepted safety code in the electrical industry throughout the United States and indeed forms the basis for those municipal electrical codes existing in New Jersey. The Code is promulgated by the National Fire Protection Association and the American Standard Association through 17 panels of recognized electrical and safety experts throughout the country, who review and revise it every three years. The procedures of adoption, review and revision reflect a national consensus of manufacturers, consumers, scientific, technical and professional organizations, and governmental agencies. While the product bears no formal governmental aegis, the manner of its adoption and revision and the universality of its acceptance indicates to us that it should be accorded the same standing for present purposes as if it were adopted and revised by some non-New Jersey governmental agency within the rationale of *Hotel Bar Foods, supra*. We therefore conclude that there was no unconstitutional delegation of legislative power in the statutory subdivision involved.

In sum, we find no constitutional defect in the Electrical Contractors Licensing Act of 1962, as amended, in any of the respects discussed. We are not, of course, to be understood as expressing an opinion on the validity of any provision of the act not here considered.

The judgment of the Chancery Division is affirmed. No costs to any party.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and HANEMAN — 6.

*For reversal* — None.