811 A.2d 484

IN THE MATTER OF THE FINAL AGENCY DECISION OF THE BOARD OF EXAMINERS OF ELECTRICAL CONTRACTORS AS TO CONDUIT INSTALLATION BY J. FLETCHER CREAMER & SON, INCORPORATED.

Superior Court of New Jersey
Appellate Division

Argued telephonically October 17, 2002—Decided December 17, 2002.

Before Judges HAVEY, A.A. ROGRÍGUEZ and WELLS.

*Maeve E. Cannon* argued the cause for appellant *International Brotherhood of Electrical Workers, Local 269* (*Hill Wallack*, attorneys; *Patrick D. Kennedy*, of counsel; *Anthony L. Velasquez* and *Len F. Collett*, on the brief).

*Richard D. McLaughlin* argued the cause for respondent *J. Fletcher Creamer & Son, Inc.*

*Susan Carboni*, Deputy Attorney General, argued the cause for respondent *Board of Examiners of Electrical Contractors* (*David Samson*, Attorney General, attorney; *Andrea M. Silkowitz*, Assistant Attorney General, of counsel; *Ms. Carboni*, on the brief).

The opinion of the court was delivered by

WELLS, J.A.D.

The International Brotherhood of Electrical Workers, Local 269, (IBEW) appeals from a final decision of the Board of Examiners

of Electrical Contractors (Board) within the Division of Consumer Affairs, Department of Law and Public Safety. That decision held that certain work performed by a contractor, J. Fletcher Creamer, (Creamer) on a New Jersey Turnpike project was not electrical work and therefore, required no permit from the Board and need not have been supervised by a Board licensed electrical contractor.

The facts, upon which the record reveals no material dispute, are simply stated. The IBEW filed a complaint with the Board when it discovered that general laborers, employees of Creamer rather than electrical workers, had installed indoor rigid metal cable-carrying conduit at a project at Exit 7 of the New Jersey Turnpike. The purpose of the project was to convert one or more toll booths for Easy–Pass use by Turnpike motorists.

The complaint charged that the conduit had not been properly grounded or bonded. It claimed the conduit was capable of carrying electrical wire and as such, required that the work be performed by electrical workers and supervised by a Board licensed electrical contractor.

Upon receipt of the complaint, the Board investigated. It discovered that the conduit in question was installed to contain fiber-optic cable to implement the high speed data transmission needs of the largely computerized project. It is undisputed that fiber-optic cable does not transmit electrical current of any voltage, but rather, transmits light pulses.

In a letter response to the complaint dated February 16, 2001, the Board, after reviewing all the documentation sent to it by the IBEW and Creamer, ruled that "there [was] insufficient cause for any action to be taken" against Creamer. The IBEW, in a letter dated March 5, 2001, asked the Board to withdraw its decision for failure to give the IBEW an opportunity to respond to Creamer's submissions and for failure to advise whether the Board had issued Creamer a license or permit for the work in question.

The Board responded on April 18, 2001. It stated:

> Please be advised that based on the review of the documentation received, the Board, in its investigation, determined that the work performed did not require a license and business permit as it did not involve a potential of more than ten volts.

The letter further indicated the Board had made its decision "as a matter of law" and that it considered the case closed.

On June 11, 2001, the IBEW wrote once again. It asserted that the work at issue "involved much more than 10 volts, and constitutes work that undeniably requires a license and business permit." Citing provisions of the Uniform Construction Code and the National Electrical Code of 1999(NEC), which refer to conduit as "raceways," the IBEW repeated its assertions that the work was electrical in nature, especially where the conduit could accept both fiber-optic cable and electrical wire in the same raceway. The letter then went to state:

> In the present instance, our investigators have found that the metal conduit connects directly to the end terminals, creating a continuous electrical conductor. The conduit is grounded in multiple location for electrical purposes, and is fully and completely bonded to the panels. (See Certification of Wayne DeAngelo, enclosed herewith.) As such, we request that the Board reconsider its prior decision based upon this evidence. Attached to the DeAngelo Certification, please find true copies of photographs taken by Mr. DeAngelo at the Exit 7 project, which indicate that the metal conduit is fully bonded directly with the panels, and is grounded. Fletcher Creamer did, in fact, engage in work necessitating a license and business permit in violation of law as set forth at length in our prior letters of complaint.

In an opinion filed on September 7, 2001, and entitled "Amplification of Final Agency Decision *Nunc Pro Tunc* Pursuant to R.2:5–1(b)," the Board handed down its final determination on the subject. The Board first reviewed the above history of the controversy. Relying in part on our 1993 unpublished decision, *In re Nat'l Elec. Contractors Ass'n, Northern N.J. Chapter, Inc., and New Jersey State Elec. Workers Ass'n, I.B.E.W., AFL–CIO,* A–3802–90T2, A–3803–90T2, (App.Div.1993), it concluded:

> The Board now amplifies as follows its original explanation of its decision in this matter:
>
> The conduit at issue here is intended—as IBEW tacitly acknowledges—to contain fiber-optic cable. This is non-conductive cable, which transmits light impulses rather than electric current, and thus has no voltage potential. For this reason, the installation of the conduit in this instance is exempt work pursuant to *N.J.S.A.* 45:5A–18(j), which exempts from business permit requirements electrical work with a potential of less than 10 volts, and beyond the jurisdiction of the Board.

> ...

> The fact that the conduit is bonded and grounded is also not determinative. The Board differentiates between bonding and grounding as an additional safety precaution, and bonding and grounding of systems that are an essential part of a building's electrical system. An example would be the iron and steel framework of a building, which is required to be grounded to the electrical system. However, this framework carries no voltage, and it has never been maintained that the framework has to be installed by a licensed electrical contractor. Similarly, air conditioning ducts are bonded for additional safety, but an individual who installs the ducts does not require licensure as an electrical contractor.
>
> The conduit in this instance, while it may be connected to a terminal box, does not carry voltage. Work with a voltage potential of no more than 10 volts is exempt work.

We affirm.

 Administrative agency decisions are subject to a uniform standard of review and will be upheld, unless the decision is "arbitrary, capricious or unreasonable or it is not supported by substantial credible evidence in the record as a whole." *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980). The reviewing court will only decide whether the agency's findings could reasonably have been reached on "substantial" or " 'sufficient credible evidence present in the record' considering 'the proofs as a whole.' " *In re Taylor,* 158 *N.J.* 644, 656, 731 *A.*2d 35 (1999) (quoting *Close v. Kordulak Bros.,* 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965)). The court gives "due regard" to the factfinder's ability to judge credibility and to the agency's expertise, where such expertise is a factor. *State v. Locurto,* 157 *N.J.* 463, 471, 724 *A.*2d 234 (1999); *In re Taylor, supra,* 158 N.J. at 656, 731 *A.*2d 35; *Close, supra,* 44 *N.J.* at 599, 210 *A.*2d 753 (1965).

We note initially that the IBEW has no interest in whether or not Creamer is or is not sanctioned by the Board. Additionally, the project itself has been long completed and no work remains to be done. For these reasons, we harbor grave reservations about IBEW's standing to bring this appeal. *See Marques v. New Jersey State Bd. of Med. Examiners,* 264 *N.J.Super.* 416, 417–18, 624 *A.*2d 1034 (App.Div.1993). Nevertheless, we decide the appeal on its merits on the ground that it affects the public interest in the

safety of electrical installations, and because while the IBEW has an obvious private interest to assert, it is more akin to a public interest group. *See generally SMB Assoc. v. New Jersey DEP,* 137 *N.J.* 58, 644 *A.2d* 558 (1994); *In re Waterfront Development Permit No. WD88–0443–1, Lincoln Harbor Final Development, Weehawken, Hudson County,* 244 *N.J.Super.* 426, 582 *A.2d* 1018 (1990), *certif. denied,* 126 *N.J.* 320, 598 *A.2d* 880 (1991).

We also reject IBEW's procedural arguments that (1) the Board's decision constituted rulemaking in violation of the Administrative Procedure Act and (2) that it was entitled to a hearing as a contested case. First, it was the IBEW that asked the Board for a specific determination in a particular case relating to a single project. While the resolution of the request involved the construction of provisions of a statute which underlies the Board's powers, that is not unusual in administrative determinations and does not invoke the rulemaking capacity of the Board. "An agency has discretion to choose between rulemaking, adjudication, or an informal disposition in discharging its statutory duty...." *Northwest Covenant Med. Ctr. v. Fishman,* 167 *N.J.* 123, 137, 770 *A.2d* 233 (2001). Adjudication or an informal agency action is defined as "any determination that is taken without a trial-type hearing, including investigating, publicizing, negotiating, settling, advising, planning and supervising a regulated industry." *Id.* at 136–37, 770 *A.2d* 233.

Here, the Board engaged in an informal agency decision rather than rulemaking. The Board's decision can be classified as an informal agency decision because the Board made its determination without a trial-type hearing after investigating a regulated industry, electrical contracting. *See Northwest Covenant Med. Ctr., supra,* 167 *N.J.* at 136–37, 770 *A.2d* 233. Additionally, the Board did not engage in rulemaking because it did not make a statement implementing or interpreting law or policy. Rather, the Board investigated and analyzed the issues raised in IBEW's complaint and reached a determination based on the facts of a particular case.

Second, there was no requirement for a trial-type contested hearing in this instance because there was no material fact in dispute about the work that was done; the kind of cable installed within the conduit; or the nature, purpose or functioning of fiber-optic cable.

An evidentiary hearing is mandated only when the proposed administrative action is based on disputed adjudicative facts. *See ibid.* In other words, " '[t]he right to a full trial-type hearing in administrative proceedings is generally limited to the situation where adjudicatory facts—that is, facts pertaining to a particular party—are in issue.' " *High Horizons Dev. Co. v. State Dept. of Transp.*, 120 *N.J.* 40, 49, 575 *A.*2d 1360 (1990) (quoting Friedman, *Judicial Review Under the Superfund Amendments*, 14 Colum. J. Envtl. L. 187, 201 (1989)). Adjudicative facts "answer the questions of who did what, where, when, how, why, [and] with what motive or intent." *Ibid.* They are the type of facts that go to a jury in a case tried before a jury. *Id.* at 49–50, 575 *A.*2d 1360.

"If a matter before an agency does not present contested material issues of fact that can be decided only 'after [an] opportunity for an agency hearing,' it is not a contested case subject to transfer to the OAL." *Sloan ex rel. Sloan v. Klagholtz*, 342 *N.J.Super.* 385, 392, 776 *A.*2d 894 (App.Div.2001) (quoting *N.J.S.A.* 52:14B–2(b)). Even if an administrative matter classifies as a "contested case," the head of the agency may elect to conduct the hearing himself. *Ibid.* The agency has the exclusive authority to determine whether an administrative matter constitutes a contested case under *N.J.S.A.* 52:14B–2(b).

As to the merits, we begin with the statutory framework underlying the Board's decision. *N.J.S.A.* 45:5A–9(a), the statute at issue in this case, provides:

[N]o person shall … enter into, engage in or work in business as an electrical contractor, unless such person has secured a business permit and such person or an officer, partner or employee who is or will be actively engaged in the business for which a business permit is sought has obtained a license from the [B]oard [of Examiners of Electrical Contractors] in accordance with the provisions of this act, and such licensee shall resume full responsibility for inspection and supervision of

all electrical work to be performed by the permittee in compliance with recognized safety standards. A licensee shall not be entitled to qualify more than one person for a business permit.

[*N.J.S.A.* 45:5A–9(a).]

An electrical contractor is defined as "a person who engages in the business of contracting to install, erect, repair or alter electrical equipment for the generation, transmission or utilization of electrical energy." *N.J.S.A.* 45:5A–2(d).

*N.J.S.A.* 45:5A–18 sets forth the type of work that is exempt from the requirements of *N.J.S.A.* 45:5A–9(a). *N.J.S.A.* 45:5A–18(j) provides:

Electrical work or construction which is performed on the following facilities or which is by or for the following agencies shall not be included within the business of electrical contracting so as to require the securing of a business permit under this act:

. . .

(j) Any work with a potential of less than 10 volts.

In this case, laborers employed by Creamer installed conduit for fiber optic cable. Fiber optic cables "transmit light for control, signaling, and communications through an optical fiber." *N.E.C.* § 770–4. There are three types of fiber optic cable which are: nonconductive, conductive, and composite. *N.E.C.* § 770–5(a)–(c). Nonconductive cable "contain[s] no metallic members and no other electrically conductive materials." *N.E.C.* § 770–5(a). Conversely, conductive cables "contain noncurrent-carrying conductive members" and composite cables "contain optical fibers and current-carrying electrical conductors." *N.E.C.* 770–5(a) and (b).

Moreover, the raceway for fiber optic cable "shall be of a type permitted in Chapter 3 and installed in accordance with Chapter 3." *N.E.C.* § 770–6. *N.E.C.* § 300–10 states:

Metal raceways, cable armor, and other metal enclosures for conductors shall be metallically joined together into a continuous electric conductor and shall be connected to all boxes, fittings, and cabinets so as to provide effective electrical continuity. Unless specifically permitted elsewhere in this [Code], raceways and cable assemblies shall be mechanically secured to boxes, fittings, cabinets, and other enclosures.

[*N.E.C.* § 300–10.]

The Board's determination that Creamer was exempt from obtaining a license as the work involved a potential of less than ten volts was reasonable and supported by the record. The record contained documentation presented to the Board by Creamer, which stated that the fiber optic cable in this case transmitted light impulses rather than electricity. Based on the information presented to it by Creamer, coupled with its expertise, the Board reasonably determined that the fiber optic cable in this case was nonconductive cable, which transmitted light rather than electric current and thus, had no voltage potential.

The Board was also reasonable in its interpretation of the word "potential" as contained in *N.J.S.A.* 45:5A–18(j), which exempts "any work with a potential of less than 10 volts" from the license and permit requirement of *N.J.S.A.* 45:5A–9. The Board viewed the word "potential" as meaning what the conduit actually contained, and quoted a definition of "potential" which stated, " '[t]he potential energy of a unit charge at any point in an electric circuit measured with respect to a given reference point in the circuit or to the ground.' " (quoting WEBSTER'S II NEW COLLEGE DICTIONARY 864 (1995)). Conversely, the IBEW construed "potential" in its almost infinite sense: what the conduit was capable of containing, or might in the future contain.

IBEW's argument that the conduit must be installed by a licensed electrical contractor because it has the potential of carrying electric wire in the future is flawed. Whether the conduit has the capacity to hold electrical wire has no bearing on the issue in this case because the conduit was neither designed to nor does it actually carry electrical wire. Rather, it carries fiber optic cable, which possesses no electrical properties.

IBEW also argued that because the conduit was bonded and grounded, apparently in conformity with the *N.E.C.* § 300–10, *infra* p. 9,[1] a license was required to perform the conduit installa-

---

[1] We note that while the IBEW's original complaint charged that the conduit had not been bonded or grounded, its later position was that it *had* been bonded and grounded.

tion under *N.J.S.A.* 45:5A–9. In the first place, the *N.E.C.* is an industry wide standard-setting technical code. It does not purport to, nor can it, usurp the right of the states to determine what licenses or permits authorize particular kinds of work.

The argument is also unavailing because the fact that grounding to an electrical system is involved does not mean that the work must be performed by a licensed electrical contractor. As the Board demonstrated in its amplified decision by way of example, the iron and steel framework of a building are required to be grounded to the electrical system; however, the framework carries no voltage and thus, it has never been required that a licensed electrical contractor install the framework. Similarly, the Board noted that air conditioning ducts are bonded; however an individual installing the ducts is not required to obtain licensure as an electrical contractor.

Finally, while we believe that the above considerations fully support our determination to affirm the Board, because we have been unable to locate any published decisions on the issue decided in or out of New Jersey, and because the parties were aware of, and to some extent relied upon our unpublished decisions, we also describe those decisions.

In *Palmer v. National Electrical Contractors Ass'n*, A–836–65, slip op. at 2 (App.Div.1967), we considered "whether or not the 'laying of pipes under highways to accommodate electrical wiring, and through which electrical wiring is generally run at some time after,' constitutes electrical contracting work" within the meaning of *N.J.S.A.* 45:5A–2(d). The Board determined that this was electrical work. Slip op. at 4. However, we, concluded that the described work was not electrical contracting work as defined in the Act. Slip op. at 9. We noted that the evidence before the Board demonstrated that "no great skill or technical knowledge is required to install this pipe." Slip op. at 8. We further recognized that it did not appear that the laborers or supervisors needed special training and experience in electrical work to perform this installation. Slip op. at 8. We also noted that it did not appear

from the evidence before the Board that the installation of pipe by general contractors in the past resulted in hazards or danger to human safety. Slip op. at 8.

Similarly, in *In re Nat'l Elec. Contractors Ass'n, Northern N.J. Chapter, Inc.*, *supra*, slip op. at 2, we considered whether " 'on-site' installation of electrical conduit, [that is, on public and private property], constituted 'electrical contracting' within the meaning of the Electrical Contractor's Licensing Act (Act), *N.J.S.A.* 45:5A–1 to –22." In the underlying complaint, an IBEW representative complained to the Board that unlicensed contractors were installing electrical conduit. Slip op at 3. The laborers argued that the conduit work was not electrical contracting, and thus, they were not subject to the Board's licensing powers. Slip op. at 3. The Board established a committee, which found that the installation of conduit was to be performed by electrical contractors. Slip op. at 3–4. A Deputy Attorney General then advised the board in a letter opinion that "conduit work 'is not statutorily reserved to licensed electrical contractors and, therefore, may be performed by general or utility contractors employing general laborers.' " Slip op. at 5.

On appeal, we agreed with the Deputy Attorney General that the installation of empty conduit does not require a license under the Act. Slip op. at 12. In reaching our decision, we stated that "conduit installation essentially involves the digging of a ditch at a designated place ..., installation of empty piping and refilling of the ditch." Slip op. at 13. We noted that this work had been historically performed by unlicensed laborers, both before and after the *Palmer* decision. Slip op. at 13. In addition, we recognized that the parties conceded that when conduit is installed, it does not contain any current carrying or non-energized wires, and the nonlicensed installers do not touch electrical wires at any time. Slip op. at 13.

We are cognizant that these decisions are factually distinguishable despite the Board's reliance on *In re Nat'l Elec. Contractors Ass'n, Northern N.J. Chapter, Inc.*, *supra*, in making it's determi-

nation. The work here was indoor work and thus, admittedly more critical from a safety perspective. Moreover, the Easy Pass installation was on a public rather than a private project, and thus, requires heightened sensitivity to jurisdictional disputes between labor unions. Nevertheless, work relating to the installation of conduit or pipe to carry wire, even that designed to carry electrical wire, is analyzed in these decisions as work of a nature that in itself does not require the skills of workers or supervisors with experience or training in the handling of electrical power, electrical wire, its grounding or its connections. For these reasons, we find them persuasive.

Affirmed.