**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2030-24

APPLIED LANDSCAPE
TECHNOLOGIES,

     Plaintiff-Appellant,

v.

COUNTY OF MIDDLESEX and
TOMCO CONSTRUCTION,

     Defendants-Respondents.

_____

Argued May 5, 2025 – Decided May 9, 2025

Before Judges Sumners and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-7337-24.

John J. Lavin argued the cause for appellant (Lavin & Associates, PC, attorneys; John J. Lavin and Daniella Fischetti, on the brief).

Michael S. Williams, Deputy County Counsel, argued the cause for respondent County of Middlesex (Thomas F. Kelso, County Counsel, attorney; Michael S. Williams, on the brief).

Mitchell W. Taraschi argued the cause for respondent Tomco Construction (Connell Foley, LLP, attorneys; Mark L. Fleder, of counsel; Mitchell W. Taraschi, of counsel and on the brief).

PER CURIAM

In this public bidding dispute, plaintiff Applied Landscape Technologies, Inc. (ALT), appeals from the Law Division order denying its request to void defendant County of Middlesex's contract award to codefendant Tomco Construction and dismissing ALT's complaint with prejudice. We affirm.

I.

The essential facts are undisputed and readily summarized. ALT and Tomco are general contractors that are familiar with submitting public bid proposals. In October 2024, the County solicited bids for the Athletic Fields in Thomas Edison Park, County Project #EDI8017 (park project). The County's solicitation provided December 5 was the deadline to submit bids. The bid solicitation section 103.01 provided that the park project would be awarded to the "lowest responsible [b]idder" conforming to the requirements "in the contract documents and bid documents submission check list."

The solicitation instructions included that bidders were required under N.J.S.A. 40A:11-16 of the Local Public Contracts Law ("LPCL"), N.J.S.A. 40A:11-1 to -60, to provide all license numbers and "names of all subcontractors

2

to whom the bidder will subcontract and furnish services, materials[,] and kindred work," including for "electrical work." The County made clear that a contractor's bid would be rejected for failing to submit the required subcontractor information. Additionally, the bid solicitation instructions stated, "If [b]idder is doing any of the above listed in-house, submit company name, license number (if applicable)[,] and evidence of business permit/certificate of authorization as may be necessary."

On December 5, 2024, after receiving five bids, the County determined Tomco's proposed bid of $77,985,000 was the lowest bid, and ALT's proposed bid of $78,147,543 was the second lowest. Tomco's bid included the subcontractors form, dated December 5 and listed Quality Electrical Construction (Quality) as its electrical work subcontractor.

On December 18, ALT filed a bid protest with the County arguing Tomco's park project contract award was void because Tomco's defective bid made it a non-responsive bidder and ALT should be awarded the park project contract as "the next lowest responsive and responsible bidder." On December 19, the County Board of Commissioners awarded its park project contract to Tomco as the lowest responsible bidder.

On December 26, ALT filed an order to show cause and verified complaint seeking to void the County's park project contract award to Tomco. ALT alleged the County's park project award was void because Tomco's bid was materially defective and non-responsive to the bid specifications based on Tomco's failure to: include its New Jersey Landscape Irrigation License;[1] and list all electrical work subcontractors for the park project in violation of N.J.S.A. 40A:11-16. Additionally, ALT requested discovery, alleging "[t]he communications and negotiations between Quality and Tomco [we]re critical" because "they could prove that Tomco improperly identified Quality as its electrical subcontractor."

On January 7, 2025, the Honorable Benjamin S. Bucca, Jr., with the consent of the parties, issued the order to show cause with temporary restraints, enjoining the County from entering the park project contract with Tomco and setting a January 28 hearing date to address ALT's requested permanent restraints. Thereafter, the parties conducted limited discovery, which included the deposition of Quality's representative, John Faccas.

Faccas testified Quality provided Tomco a gross bid number of $11,850,753 for the electrical work. Quality's bid specifically excluded the

---

[1] ALT does not appeal the trial judge's order dismissing its claim that Tomco's bid had an irrigation license defect.

"excavation" and "underground conduits and [junction] boxes" work.  Faccas described the park project conduits as "tak[ing] the infrastructure underground to all the facilities electrically."  Further, he explained in the "past history with them, [Tomco] performed that work with their own forces."  He maintained Quality remained ready to complete the electrical work under the bid.

ALT's expert Frederick Porcello, a licensed professional engineer and planner, authored an expert report dated January 23.  Porcello opined Tomco's bid proposal did not include the "entire electrical scope of work for the [park p]roject[,] as it expressly identified four exclusions" for the "installation of underground conduits and junction boxes."  He further opined the "installation of conduit and electrical junction boxes . . . must be carried out by a licensed electrician," citing the New Jersey Uniform Construction Code (UCC), N.J.S.A. 52:27D-119 to -141, which incorporates the National Electric Code (NEC).[2] ALT's expert relied on NEC provisions regarding the installation of conduits and junction boxes.

---

[2] The NEC "is the standard accepted safety code in the electrical industry throughout the United States and indeed forms the basis for those municipal electrical codes existing in New Jersey."  Indep. Electricians & Elec. Contractors' Ass'n v. N.J. Bd. of Exam'rs of Elec. Contractors, 54 N.J. 466, 483 (1969); see also Brown v. Jersey Cent. Power & Light Co., 163 N.J. Super. 179, 196 n.3 (App. Div. 1978) (stating the NEC is "the controlling electrical construction code in New Jersey").

A-2030-24

After argument on January 28, Judge Bucca ordered a limited testimonial hearing to address whether Tomco had listed Quality knowing "it was not going to perform all the [electrical] work that . . . the County was led to believe by the bid" and whether Tomco's self-performance of conduit and junction box work falls under the category of "electrical work that must be performed under the license of . . . [an] electrician." ALT relied on Tomco's text messages with Quality and its expert report in arguing factual issues existed regarding whether "Quality . . . would perform all the work" that a licensed electrician was required to perform. Mindful of the time constraints the County faced, because the park project relies on grant funding and requires closure to the public, the judge appropriately ordered an expedited hearing date.

On February 24, Thomas Schoonmaker, Jr., Vice President of Tomco, provided a supplemental certification stating that the "[i]nstallation of underground and empty conduits and junction boxes does not need to be installed by a licensed electrician and []is work . . . routinely performed by non-licensed contractors and laborers in New Jersey." He represented Tomco would install the "empty electrical conduit and junction boxes," and Quality's electrical work included "supervising and inspecting Tomco's . . . work to ensure" it met "Code requirements" and would "pass inspection."

6

During the March 5 hearing, ALT argued Tomco could not self-perform electrical work on the project, as Tomco failed to include in its bid that it was performing "in-house" work and was unlicensed. ALT alternatively argued that even if Tomco was licensed and able to self-perform the electrical work, its bid was still materially defective because Tomco failed to identify itself in the bid as a licensed electrician.

Schoonmaker testified that Tomco would install the park project's underground conduits and junction boxes, and Quality would perform the electrical work. He described that Tomco installs conduits, which are pipes made from steel, plastic Polyvinyl Chloride (PVC), or other material that wires are placed inside of, and electrical inspectors examine the installation. On this project, he maintained Quality's bid included supervising and inspecting Tomco's installation work. He averred Tomco commonly used this arrangement with Quality and other electrical subcontractors for its different projects. Schoonmaker asserted Tomco was not required to list itself as an electrical subcontractor because it would "not [be] performing any electrical work."

Porcello testified that the installation of conduits, circuits, and junction boxes is electrical work, which a licensed electrician is required to perform, as it falls under the auspices of the Board of Examiners for electrical contractors.

A-2030-24

Regarding the purpose of a conduit, he explained it protects wiring. He opined that the installation of conduits, circuits, and junction boxes was electrical work because there are "safety features that are inherent in this type of work that require[] a knowledgeable individual . . . do[] the work." Porcello clarified that installers did not have to be licensed so long as they are supervised employees of the licensed electrician permit holder. He opined that the installation of conduits is part of an electrical branch circuit, and "electrical contracting work includes the installation, erection, repair, [and] alteration of electrical equipment, which . . . provid[e] electrical energy from the overcurrent protection to the receptacle switch or other device."

In his view, the installation of a conduit requires electrical expertise because specialized skill is needed "to make sure it is properly supported, that the joints are properly glued, [and] that the bedding material is the correct bedding material." Acknowledging that the foundation for his opinion was that conduit installation requires an electrical permit, Porcello conceded that an unsupervised laborer could install conduits if installation was not considered electrical work requiring a permit. He also admitted that the Electrical Contractor's Licensing Act (Act), N.J.S.A. 45:5A-1 to -55, "defines what electrical work is required to be performed by a licensed electrical contractor"

8

and acknowledged that the Act does not specifically include that conduit work is considered an item under electrical work.

Following the testimonial hearing, Judge Bucca found Tomco's bid was not materially defective after determining that a licensed electrician is not required to perform conduit installation because it is not considered electrical work. The judge noted that it was undisputed Tomco listed Quality as the electrical subcontractor bound to complete the park project's electrical work and that Quality's "pre-bid price quote obtained by Tomco . . . specifically excluded the conduit work." In finding conduit work did not constitute electrical work, the judge ruled that the Act controls "who can perform the [electrical] work" and that the UCC and NEC are irrelevant because they "control the manner in which electrical work is to be performed." He determined legal precedent is clear that "[c]onduit work in and of itself is not electrical work" because "[t]his work can be performed by a laborer" without any "require[d] . . . special skill, experience or training." The judge denied ALT's application for permanent restraints and dismissed its complaint.

On appeal, ALT contends the judge erred in: finding that the installation of conduit and junction boxes is not electrical work under the LPCL; failing to find Tomco's bid is materially defective because installing conduit and junction

9

boxes for branch circuits requires an electrical permit and Tomco is not licensed to do electrical work; and dismissing its complaint because Tomco's bid is non-responsive based on failing to list itself as an electrical contractor.

## II.

"We use a deferential standard of review for governmental decisions in bidding cases." Anselmi & DeCicco, Inc. v. J. Fletcher Creamer & Son, Inc., 480 N.J. Super. 454, 462 (App. Div. 2025) (quoting Ernest Bock & Sons-Dobco Pennsauken Joint Venture v. Township of Pennsauken, 477 N.J. Super. 254, 263 (App. Div. 2023)). "[T]he standard of review on the matter of whether a bid on a local public contract conforms to specifications (which is a component of the ultimate issue of who is the lowest responsible bidder) is whether the decision was arbitrary, unreasonable[,] or capricious." Waste Mgmt. of N.J., Inc. v. Union Cnty. Utils. Auth., 399 N.J. Super. 508, 525 (App. Div. 2008) (quoting In re Protest of Award of On-Line Games Prod. & Operation Servs. Cont., Bid No. 95-X-20175, 279 N.J. Super. 566, 590 (App. Div. 1995)). "If a public entity's decision is grounded rationally in the record and does not violate the applicable law, it must be upheld." Anselmi & DeCicco, Inc., 480 N.J. Super. at 462 (quoting Ernest Bock & Sons-Dobco Pennsauken Joint Venture, 477 N.J. Super. at 263). "[W]e review issues of statutory interpretation de novo." Ibid.

"When interpreting a statute, [the] aim [is] to effectuate the Legislature's intent, which is best indicated by the statutory text." Id. at 463 (alterations in original) (quoting Keyworth v. CareOne at Madison Ave., 258 N.J. 359, 379 (2024)). "If the text's plain meaning is clear and unambiguous, we apply the law as written." Id. at 464 (quoting Keyworth, 258 N.J. at 380). "Statutory interpretation in public bidding disputes can be 'a matter of great public interest.'" In re Protest of Cont. Award for Project A1150-08, N.J. Exec. State House Comprehensive Renovation and Restoration, 466 N.J. Super. 244, 264 (App. Div. 2021) (quoting Advance Elec. Co. v. Montgomery Twp. Bd. of Educ., 351 N.J. Super. 160, 167 (App. Div. 2002)).

The objectives of the public bidding statutes are "to promote the honesty and integrity of those bidding and of the system itself," Keyes Martin & Co. v. Dir., Div. of Purchase & Prop., 99 N.J. 244, 256 (1985), "to guard against favoritism, improvidence, extravagance and corruption," and "to secure for the public the benefits of unfettered competition." Ibid. (quoting Terminal Constr. Corp. v. Atl. Cnty. Sewerage Auth., 67 N.J. 403, 410 (1975)). "The purpose of such statutes is 'to secure the benefits of competition for the public, and they are to be strictly construed to achieve this end.'" Clyde N. Lattimer & Son Const.

11

Co. v. Twp. of Monroe Utils. Auth., 370 N.J. Super. 130, 137 (App. Div. 2004) (quoting Stano v. Soldo Const. Co., 187 N.J. Super. 524, 535 (App. Div. 1983)).

We are also guided by well-established principles governing public bidding disputes. A public contract shall be awarded to "the lowest responsible bidder," N.J.S.A. 40A:11-4(a), where "'[l]owest responsible bidder'. . . means the bidder or vendor: (a) whose response to a request for bids offers the lowest price and is responsive; and (b) who is responsible." N.J.S.A. 40A:11-2(27). "'Responsive' means conforming in all material respects to the terms and conditions, specifications, legal requirements, and other provisions of the request." N.J.S.A. 40A:11-2(33). "[A] public contract award is not determined simply by the lowest bid, but rather by the lowest bid that 'complies with the substantive and procedural requirements in the bid advertisements and specifications.'" Muirfield Constr. Co. v. Essex Cnty. Improvement Auth., 336 N.J. Super. 126, 132 (App. Div. 2000) (quoting Gaglioti Contracting, Inc. v. City of Hoboken, 307 N.J. Super. 421, 431 (App. Div. 1997)) (internal quotation marks omitted). "[A]ll bids must comply with the terms imposed, and any material departure invalidates a nonconforming bid as well as any contract based upon it." CFG Health Sys., LLC v. County of Hudson, 413 N.J. Super. 306, 315

(App. Div. 2010) (quoting <u>Meadowbrook Carting v. Borough of Island Heights</u>, 138 N.J. 307, 314 (1994)).

N.J.S.A. 40A:11-23.2 provides that "[w]hen required by the bid plans and specifications," certain "requirements shall be considered mandatory items to be submitted at the time specified . . . for the receipt of the bids." One of the five enumerated requirements is "[a] listing of subcontractors pursuant to . . . [N.J.S.A. 40A:11-16]." N.J.S.A. 40A:11-23.2(d). "[T]he failure to submit any one of the mandatory items shall be deemed a fatal defect that shall render the bid proposal unresponsive and that cannot be cured by the governing body." N.J.S.A. 40A:11-23.2. The question of materiality arises only after a determination is made that a bid deviates from the bid specifications. <u>See</u> <u>Weidner v. Tully Env't, Inc.</u>, 372 N.J. Super. 315, 323 (App. Div. 2004). "[A] public entity may not waive any material departure from bid specifications or requirements of law, and is bound to reject a non-conforming bid with such defects." <u>Ernest Bock & Sons-Dobco Pennsauken Joint Venture</u>, 477 N.J. Super. at 256 (quoting <u>Serenity Contracting Grp., Inc. v. Borough of Fort Lee</u>, 306 N.J. Super. 151, 156 (App. Div. 1997)).

"N.J.S.A. 40A:11-16 [is] commonly referred to as the [a]nti-[b]id [s]hopping [l]aw." Clyde N. Lattimer & Son Constr. Co., 370 N.J. Super. at 133. It provides in relevant part:

> (1) In the preparation of plans and specifications for the construction, alteration or repair of any public building by any contracting unit, . . . the architect, engineer or other person preparing the plans and specifications may prepare separate plans and specifications for branches of work in the following categories:
>
>      . . . .
>
> (3) Electrical work, including any electrical power plants, tele-data, fire alarm, or security system.
>
> [N.J.S.A. 40A:11-16(a).]

A bidder's failure to submit "a subcontractors list, in violation of N.J.S.A. 40A:11-16, is a material and non-waivable irregularity." Gaglioti Contracting, Inc., 307 N.J. Super. at 434.

"An electrical contractor is defined as 'a person who engages in the business of contracting to install, erect, repair or alter electrical equipment for the generation, transmission or utilization of electrical energy.'" In re Final Agency Decision as to Conduit Installation by J. Fletcher Creamer & Son, 356 N.J. Super. 42, 50 (App. Div. 2002) (quoting N.J.S.A. 45:5A-2(d)). N.J.S.A. 45:5A-18 enumerates the electrical work exempt from established permit and

14

licensure requirements in N.J.S.A. 45:5A-9(a).  Ibid.  N.J.S.A. 45:5A-18(j) provides in pertinent part that "[a]ny work with a potential of less than 10 volts" "shall not be included within the business of electrical contracting so as to require the securing of a business permit."

III.

Guided by these principles, we address the heart of ALT's contention that Tomco's bid is defective because Tomco intends to self-perform conduit and junction box installation work, which a licensed electrician is required to perform.  ALT argues the LPCL controls and provides a broader definition of the scope of electrical work a licensed electrician must perform, including conduit and junction box installation.  We are not persuaded.

Judge Bucca correctly found Tomco's installation of conduits and junction boxes does not constitute work a licensed electrician is required to perform.  In Creamer, we found persuasive the contention that:

> [W]ork relating to the installation of conduit or pipe to carry wire, even that designed to carry electrical wire, is . . . work of a nature that in itself does not require the skills of workers or supervisors with experience or training in the handling of electrical power, electrical wire, its grounding or its connections.
>
> [356 N.J. Super. at 54.]

We concluded a licensed electrician is not required to install conduit piping because no technical knowledge is needed. See id. at 52. ALT argues the specific type of work that the conduits or pipes are installed for mandates a different legal analysis and result. ALT highlights that Creamer involved conduits for fiber optic cables, and the present facts involve conduits for electrical wiring. This argument is unavailing because what the conduits will later hold does not create a legal distinction. Relevantly, ALT provides no supporting authority for its position.

Further, contrary to ALT's contention, the LPCL anti-bid shopping provision, N.J.S.A. 40A:11-16(a)(3) states, "Electrical work, including any electrical power plants, tele-data, fire alarm, or security system" but does not specifically delineate that the installation of conduits and junction boxes is electrical work. We also reject ALT's argument that the NEC governs and dictates that conduit and junction box work is electrical work that a licensed electrician must perform. The NEC "is an industry wide standard-setting technical code. It does not purport to, nor can it, usurp the right of the states to determine what licenses or permits authorize particular kinds of work." Creamer, 356 N.J. Super. at 52. Thus, the NEC delineates the manner in which

16

the electrical work is performed and does not dictate what constitutes electrical work requiring licensure.

We commend Judge Bucca's decision to hold an expeditious testimonial hearing, which permitted expansion of the record. We conclude the record amply supports the judge's sound determination that Tomco was a responsive bidder complying with providing the mandatory bid specifications, N.J.S.A. 40A:11-23.2(d), and the anti-bid shopping provision, N.J.S.A. 40A:11-16(a)(3), by naming Quality as its electrical subcontractor. It is undisputed that Tomco was not required to get a proposal from Quality as the licensed subcontractor. Further, Faccas' deposition testimony demonstrates his electrical work proposal to Tomco included all the electrical work, his "pricing [was] for the entire project," including supervision and inspection of Tomco's work, and Quality was ready and able to perform the park project's electrical work for Tomco. Faccas established that Quality's bid proposal was for all the electrical work excluding the park project "conduits that take the infrastructure underground to all the facilities electrically, and excavation and installation of those conduits and junction boxes." As Tomco's bid only listed Quality as the licensed subcontractor for the park project's electrical work, it is undisputed that only Quality can perform the electrical work required.

17

If we were to accept ALT's argument that the work included in the electrical sections of the plans and technical specifications of the bid dictates whether work is electrical work, then all bidders would be required to list anyone performing services that support an electrical subcontractor's work. Such a requirement is not statutorily mandated and would be impracticable. Public bidding statutes "are for the benefit of the taxpayers and are construed as nearly as possible with sole reference to the public good." Keyes Martin & Co., 99 N.J. at 256 (quoting Terminal Constr. Corp., 67 N.J. at 409-10).

In sum, the record amply supports the judge's finding that ALT failed to meet its burden of proving that the installation of conduits and junction boxes is electrical work that a licensed electrician is required to perform. Specifically, ALT failed to establish a distinction should not be found between the installation of supporting components for electrical work that a laborer can perform and the electrical work a licensed electrician is required to perform. The judge correctly found the conduit work "can be performed by a laborer because it does not require any special skill" and "Tomco does not need to be supervised [in performing the conduit work] by a licensed electrician." As we concur that there was no defect in Tomco's bid, the County's acceptance of Tomco's bid was not arbitrary, capricious, or unreasonable.

To the extent that we have not addressed plaintiff's remaining contentions, it is because they lack sufficient merit to be discussed in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division